IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 22-po-07015-MEH

UNITED STATES OF AMERICA,

    Plaintiff,

v.

CHRISTOPHER J. CORDOVA,

    Defendant.

## VERDICT

**Michael E. Hegarty, United States Magistrate Judge.**

This matter came before me for a bench trial on March 16, 2023. The Information charged two counts: (1) failing to comply with official signs of a prohibitory, regulatory, and directory nature and with lawful direction of Federal police officers and other authorized individuals under 41 C.F.R. § 102-74.385; and (2) unlawfully photographing Federal property under 41 C.F.R. § 102.74.420. Based on the following, I find Mr. Cordova guilty on both counts.

## FACTS

The underlying facts of this case are not disputed. Mr. Cordova went to the offices of the United States Social Security Administration (SSA) at 8000 Southpark Lane, Littleton, Colorado (SSA Office) on Tuesday, August 2, 2022. He used a video camera as he entered the building, being a self-described journalist. This was an ordinary business day, during normal work hours, and in the SSA Office were SSA employees, persons seeking the SSA's assistance, contract security officers, and Homeland Security uniformed officers. Virtually the entirety of Mr.

Cordova's experience in the SSA Office that day (and certainly anything of relevance) was recorded, and material portions were replayed during the trial.

The SSA Office is a free-standing building with the SSA as the sole tenant. As one enters the building from the outdoors through exterior glass doors, there is a rectangular space of perhaps several hundred square feet with no furnishings of any kind, with plate glass windows at the fore and aft, and frame construction on the right and left. The glass in this space had taped signs in several places stating that photography and videography were prohibited, citing "Federal law and SSA policy." The signs bore the SSA's official seal. There was also a sign posting the SSA Office's hours as 9:00 a.m. to 4:00 p.m. As one walks through this first space, there is another set of glass doors; these interior doors lead to the office space in which SSA employees do business with the public. Immediately inside the office space on the left are chairs for waiting customers. The rest of the office space includes desks, tables, other chairs, a check-in kiosk, and five stations (marked A-E) with partial walls between each, at which customers approach and talk confidentially with SSA employees who are behind glass windows.

On the day in question, Mr. Cordova entered the exterior glass doors and filmed inside the first space. He was there perhaps three hours. Although contract and uniformed law enforcement officers were with him much of the time, they did not impede his filming or monologue. Because there were large plate glass windows on either side of this space, Mr. Cordova was able to freely film what was occurring beyond the interior, second set of glass doors. He filmed persons going in and out of the office, persons sitting in the office, and persons being assisted by SSA employees, with virtually an unobstructed view of the entirety of the office area.

At a defined moment during his visit, Mr. Cordova declared his intention to walk through the second set of doors, into the office area, and continue filming. The officers who were present

informed him that was against SSA regulations, and that he would be arrested if he proceeded. The posted signs informed him of the same prohibition. And he was shown a copy of the actual regulation. Mr. Cordova testified at trial that when he went to the SSA Office, he already knew the regulation and its contents. Further, immediately inside the interior, second set of doors was an obtrusive sign on a stand stating, "[p]ersonal electronic devices (cell phones, cameras) may not be used to take photographs or to make video recordings." This sign also had the official SSA seal.

Mr. Cordova indeed entered the SSA office area while filming and monologuing and was arrested at that time. These charges ensued.

## **LEGAL AUTHORITY**

First, I begin with the proposition, although not raised by either party at trial, that the regulations in question "purport to impose criminal penalties." *United States v. Baldwin*, 745 F.3d 1027, 1031 (10th Cir. 2014). These regulations jurisdictionally form the proper basis for a criminal charge. *Id.*

Second, I should "assum[e] that the ordinary meaning of the regulation's language expresses" its purpose and enforce it "according to its terms." *See Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 251 (2010) (internal quotation marks omitted). "When called on to resolve a dispute over a [law's] meaning, this Court normally seeks to afford the law's terms their ordinary meaning." *Niz-Chavez v. Garland*, 141 S. Ct. 1474, 1480 (2021). I believe this applies with equal force to interpreting a regulation. As the Supreme Court has noted with regard to Federal regulations: "[A] court must apply all traditional methods of interpretation to any rule, and must enforce the plain meaning those methods uncover." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2419 (2019). The Tenth Circuit has further stated, "[w]hen interpreting regulations, 'we begin our analysis by examining the plain language of the text of the regulation, giving the words their ordinary meaning.

. . . If the meaning of the text is clear, our endeavor is at an end, and we must enforce the regulation in accordance with its plain meaning." *Nat. Res. Def. Council v. McCarthy*, 993 F.3d 1243, 1251 (10th Cir. 2021) (quoting *Bd. of Educ. of Gallup-McKinley Cnty. Schs. v. Native Am. Disability Law Ctr., Inc.*, 959 F.3d 1011, 1013 (10th Cir. 2020)). "[U]nless there is a clear manifestation to the contrary, general words, not specific or limited, should be construed as applicable to cases or matters of like kind with those described by the particular words." *United States v. Stever*, 222 U.S. 167, 174 (1911).

Finally, both the Supreme Court and the Tenth Circuit commonly rely on an ordinary dictionary to ascertain the meaning of a law's wording. *See, e.g.*, *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1759 (2018) (using Webster's Third New International Dictionary (1976)); *Nat. Res. Def. Council v. McCarthy*, 993 F.3d 1243, 1252 (10th Cir. 2021) (using Merriam-Webster Dictionary).

## ANALYSIS

### I.   Count 1

Count 1 alleges Mr. Cordova violated 41 C.F.R. § 102-74.385. Under that section, "[p]ersons in and on property must at all times comply with official signs of a prohibitory, regulatory or directory nature and with the lawful direction of Federal police officers and other authorized individuals." *Id.* Based on my analysis of Count 2, *see infra* § II, I find beyond a reasonable doubt the SSA law enforcement officers gave Mr. Cordova "lawful direction[s]" to not film in the SSA interior office and warned him that he would be arrested if he did, yet Mr. Cordova failed to comply. *Id.* Mr. Cordova also failed to comply with "official signs of a prohibitory, regulatory, [and] directory nature." *Id.* Incidentally, unlike the language in the following regulation under Count 2, Mr. Cordova does not challenge the meaning of these words.

**II.     Count 2**

Count 2 alleges Mr. Cordova violated 41 C.F.R. § 102-74.420 which *prohibits* photographing "[s]pace occupied by a tenant agency" without permission of the occupying agency. *Id.* at (a), (b). It *permits* photographing "[b]uilding entrances, lobbies, foyers, corridors, or auditoriums for news purposes." *Id.* at (c). I accept Mr. Cordova was filming for news purposes. So, was Mr. Cordova in "space occupied by" the SSA, or was he filming in a subsection (c) space at the time he was arrested?

I start with subsection (c). From the textual presentation in the regulation, subsection (c) is clearly intended to address a different physical space than subsections (a) and (b) describe. The spaces identified in subsection (c) appear to describe a series of like kind words and should be interpreted as such. I agree with the following pertinent explanation:

> *Ejusdem generis* refers to the principle that "when a general term follows a specific one, the general term should be understood as a reference to subjects akin to the one with specific enumeration." *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 223, 128 S. Ct. 831, 169 L.Ed.2d 680 (2008) (internal quotation marks and citation omitted). Relatedly, the doctrine of *noscitur a sociis* "raises the implication that the 'words grouped in a list should be given related meaning.'" *S.D. Warren Co. v. Maine Bd. of Envtl. Prot.*, 547 U.S. 370, 378, 126 S. Ct. 1843, 164 L.Ed.2d 625 (2006) (internal quotation marks and citation omitted). Together, these rules "instruct that words in a series should be interpreted in relation to one another." *Ali*, 552 U.S. at 229, 128 S. Ct. 831 (Kennedy, J., dissenting).

*Alice F. v. Health Care Serv. Corp.*, 367 F. Supp. 3d 817, 825 (N.D. Ill. 2019). The Merriam-Webster Dictionary provides the following definitions of subsection (c)'s spaces:

> **Entrance:** "[T]he means or place of entry." *See Entrance*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/entrance (last visited on Mar. 20, 2023).
>
> **Lobby:** "[A] corridor or hall connected with a larger room or series of rooms and used as a passageway or waiting room." *See Lobby*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/lobby (last visited on Mar. 20, 2023).
>
> **Foyer:** "[A]n entrance hallway." *See Foyer*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/foyer (last visited on Mar. 20, 2023).

5

> **Corridor:** "[A] passageway (as in a hotel or office building) into which compartments or rooms open." *See Corridor*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/corridor (last visited on Mar. 20, 2023).
>
> **Auditorium:** "[T]he part of a public building where an audience sits." *See* Auditorium, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/auditorium (last visited on Mar. 20, 2023).

Under all the interpretation rules and methods described above, I do not hesitate to ascribe to the first four of these a meaning that encompasses the first space into which Mr. Cordova entered on August 2, 2022, the glassed entry space where, logically, persons seeking to do business with the SSA would collect themselves, wipe their feet, brush off snow, or otherwise prepare to enter the SSA Office. No SSA business would logically occur in this space, nor did any occur during the hours of filming on August 2, 2022.

At first glance, the word "auditorium" has an apparently different meaning than the previous four words, but when applying *ejusdem generis* and *noscitur a sociis*, in the context of this regulation, it describes a space in which the public congregates but would not be engaging in individual, personal transactions with the occupying agency, corporation, school, church, theater, or other organization.

On the other hand, through that interior, second set of doors, the SSA conducted its primary business of assisting the public. During Mr. Cordova's filming, members of the public (including children) were indeed conducting business there, people were in chairs waiting for their turn, a customer check-in kiosk with a video screen was there, along with other indicia of a typical office setting.

Mr. Cordova argues that 41 C.F.R. § 102-74.420 is unconstitutionally vague in employing the terms defined above. He contends that the area in which he was arrested could reasonably be included within the subsection (c) list. I disagree under the facts and circumstances of this case.

The Tenth Circuit in the *Baldwin* case has noted in this regard: "The Supreme Court has told us (repeatedly) that the relevant question in void for vagueness challenges is merely whether the defendant before us 'had fair notice from the language' of the law 'that the particular conduct which he engaged in was punishable.'" 745 F.3d at 1031-32 (quoting *Parker v. Levy*, 417 U.S. 733, 755 (1974)). It is clear based on the regulation, the signage in the SSA entryway, the instructions given by law enforcement, and Mr. Cordova's own understanding of the law that he had fair notice of the law and that his conduct in filming beyond the interior glass doors was punishable.

The facts established Mr. Cordova knew the SSA and its law enforcement officials interpreted the law as prohibiting filming inside the second set of interior doors where the SSA was conducting business with its customers. He had fair notice of the language of the regulation, and that his conduct would be punishable under the Government's interpretation of it. Granted, he has a philosophical disagreement with that interpretation, for which he was prepared to, and in fact expected to, be arrested. Although I respect his right to challenge the law and test his constitutional rights to their outer limit, he is wrong in this instance.

Under a different set of facts, where a person might enter from the outdoors directly into a Federal office, the outcome could be different. Here, there was a distinct entryway from the outdoors, corresponding with a subsection (c) space, after which was a set of interior doors leading to a distinct and unmistakable office space, corresponding with subsections (a) and (b). Without the SSA's permission to film in this office, which Mr. Cordova did not have, he violated the law.

For these reasons, I find beyond a reasonable doubt that Mr. Cordova entered in and on Federal property and unlawfully photographed space occupied by a Federal agency, without permission, in violation of 41 C.F.R. § 102-74.420.

## **CONCLUSION**

For the foregoing reasons, Mr. Cordova is adjudicated guilty on Counts 1 and 2 of the Information, and the Court will enter judgment consistent with this verdict. This matter will be set for sentencing at a time convenient for all parties.

Entered March 20, 2023, at Denver, Colorado.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge