1

1            UNITED STATES DISTRICT COURT
                 DISTRICT OF COLORADO
2

3   UNITED STATES OF AMERICA,      .  Case No. 22-po-07015-MEH-1
                                   .
4          Plaintiff,              .
                                   .
5   vs.                            .  Alfred A. Arraj Courthouse
                                   .  901 19th Street
6   CHRISTOPHER J. CORDOVA,        .  Denver, CO  80294
                                   .
7          Defendant.              .
                                   .  March 16, 2023
8   . . . . . . . . . . . . . . .  .  9:02 a.m.

9
         **TRANSCRIPT OF PROCEEDINGS HELD BEFORE THE HONORABLE**
10         **MICHAEL E. HEGARTY, UNITED STATES MAGISTRATE JUDGE**

11
     APPEARANCES:
12
     For the Plaintiff:          U.S. Attorney's Office
13                               By:  Craig G. Fansler
                                 By:  Thomas J. Minser
14                               1801 California Street
                                 Suite 1600
15                               Denver, CO  80202
                                 (303) 454-0100
16
     For the Defendant:          Ascend Counsel, LLC
17                               By:  Edward M. Schwab
                                 2401 South Downing Street
18                               Denver, CO  80210
                                 (303) 888-4407
19
     Court Recorder:             Clerk's Office
20                               U.S. District Court
                                 901 19th Street
21                               Denver, CO  80294

22   Also Present:               Christopher J. Cordova
                                 Douglas Whiles
23

24

25

1   Appearances continued:

2   Transcription Service:        AB Litigation Services
                                  216 16th Street, Suite 600
3                                 Denver, CO  80202
                                  (303) 296-0017
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
    Proceedings recorded by electronic sound recording;
25  transcript produced by transcription service.

3

1                              INDEX

2

3    WITNESS                  Direct    Cross    Re-Direct    Re-Cross

     DOUGLAS WHILES
4    By Mr. Fansler              14
     By Mr. Schwab                        43
5
     CHRISTOPHER CORDOVA
6    By Mr. Schwab              68
     By Mr. Fansler                       73
7    By Mr. Schwab                                    76

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

```
 1                    (Time noted:  9:02 a.m.)

 2              THE COURT CLERK:  All rise.  United States

 3   District Court for the District of Colorado is now in

 4   session.  The Honorable Michael E. Hegarty, United States

 5   Magistrate Judge, presiding.

 6              THE COURT:  Please be seated.  On the record in

 7   the trial of United States of America versus Christopher J.

 8   Cordova, 22-po-07015.

 9              Please make your appearances.

10              MR. FANSLER:  Good morning, Your Honor.  Craig

11   Fansler and Tom Minser on behalf of the United States.

12              THE COURT:  Good morning to you.

13              MR. SCHWAB:  Good morning, Your Honor.  Milo

14   Schwab on behalf of Defendant Christopher Cordova, who is

15   here.

16              And before we get going, I wanted to apologize for

17   our tardiness.

18              THE COURT:  I was late, too.

19              MR. SCHWAB:  Okay.  Thank you, Your Honor.

20              THE COURT:  Fortunately, the United States doesn't

21   charge by the hour.  They are captive and paid a salary, like

22   I was when I was in the office.

23              Okay.  Do we want to have brief opening

24   statements?

25              MR. FANSLER:  Yes, Your Honor.
```

 1              THE COURT:  When you're ready.  First, any

 2    preliminary matters at all?

 3              MR. FANSLER:  Not from the United States.

 4              THE COURT:  Any preliminary matters?

 5              MR. SCHWAB:  Not from defense, Your Honor.

 6              THE COURT:  Okay.  When you're ready.

 7              MR. FANSLER:  Good morning.

 8              THE COURT:  Good morning.

 9              MR. FANSLER:  On Tuesday, August 2, 2022, just

10    before noon, this Defendant, Christopher Cordova, went to the

11    Social Security Office in Littleton, Colorado, to commit a

12    crime by live streaming video because he wanted to create a

13    court case.

14              He planned before he got there to ignore every

15    sign and everyone who told him not to film.  He did exactly

16    that.

17              He ignored the agency's customers that day, who

18    didn't want them filming their private business inside of the

19    Social Security Office.

20              Of all of the places he could have chosen to

21    engage in criminal disobedience, he chose a Social Security

22    Office.  He picked an agency whose business is private

23    confidential information.

24              Inside the office, private information is

25    discussed all day long.  Customers hold private documents,

1   they have private conversations, and with their caretakers

2   and other family members, they go to customer service windows

3   where they discuss their personal and private information.

4           On August 2nd, Mr. Cordova saw four signs

5   prohibiting live streaming.  He ignored those signs, as he

6   planned to do all along.

7           He was told more than eight times, by four Federal

8   security officers, that he could not film inside.  Mr.

9   Cordova ignored these directives, as he planned to do all

10  along.

11          He was also given a copy - twice - of the General

12  Services Administration regulation prohibiting photography.

13  Mr. Cordova ignored this regulation, as he planned to do all

14  along.

15          Instead, he set up his camera so that it faced a

16  sign prohibiting photography, and he did that for 3 hours and

17  13 minutes.  It's clear that he did not like the signs.

18      (Video played in open Court)

19          THE COURT:  Go ahead.  Please stand.

20          MR. SCHWAB:  I had stipulated to the admission of

21  this video and to statements made by Mr. Cordova in this

22  video, but not the statements made by other individuals

23  unless they testified.  And I think the playing of this is

24  potentially prejudicial at the moment.

25          THE COURT:  Okay.  Do you think it's admissible

1   under the Rules of Evidence?

2           MR. SCHWAB:  I do not believe statements made by

3   other individuals in this video are admissible for the

4   purposes -- because they are hearsay.

5           THE COURT:  Okay.

6           MR. SCHWAB:  If they're being introduced just to

7   say that people said -- people talked to him, sure.  But for

8   any information contained within those statements, no, that's

9   hearsay.

10          THE COURT:  Okay.  Response, please?

11          MR. FANSLER:  I think the opportunity to raise

12  this would have been before trial.  Nothing was raised before

13  trial.

14          Be that what it is, this video is replete with

15  admissions from the Defendant, and there's lots of other

16  statements that show context, they show the effect on the

17  listener that show knowledge.  He's the one that's recording

18  this.  He sees everything.

19          I also think at a Bench trial, Your Honor is able

20  to evaluate relevance and hearsay at a later point if he does

21  feel that arises.

22          But there's really no question that these are not

23  for the truth of the matter.

24          THE COURT:  Sure.  That's what I will find in any

25  kind of recording like this, statements made by others are

1  typically admissible for the purpose of the response they

2  elicited.  So if they're not being introduced necessarily for

3  the truth of the matter, but was stated in the response that

4  was stated back.

5         Furthermore, if we just had the statements of your

6  client, it would be completely out of context.

7         And so I find it is admissible.  Go ahead.

8         MR. SCHWAB:  Sure.  Just to clarify, he also --

9  the U.S. also just stated that he was told multiple times,

10 and I'm worried that they are going to be introducing this

11 video.  Those statements were made by security guards, and

12 those security guards have been noticed as witnesses.

13        And so to the extent that they're talking about he

14 was told multiple times, that would be inadmissible.

15        THE COURT:  Okay.  What's your response to that?

16        MR. FANSLER:  Again, it's all in the video that

17 what is said to him and the effect it has to him, and how he

18 then moves his camera to show what he's seeing, there is a

19 law enforcement witness that's going to testify and was there

20 that day, and can -- we can certainly revisit that later on

21 if counsel wants to.

22        THE COURT:  So I think they -- well, certainly

23 they are potentially admissible -- well, they are relevant to

24 show the issue of knowledge, for example.  So if someone

25 doesn't have knowledge of the law, or they do have knowledge

1   of the law, is a relevant issue.

2          And if proper peace officer is giving somebody

3   notice of a law, and the person receiving it, in this case

4   your client, understands that and hears that, and acts in

5   whatever way that the evidence will show he acted, that

6   demonstrates knowledge and intent.

7          And so, again, it's potentially admissible for the

8   purpose of knowledge and intent on your client, but not

9   necessarily for the truth of the matter.

10          MR. SCHWAB:  Sure.  And just to be clear, I'm not

11   contesting relevance.  What I would say --

12          THE COURT:  Sure.

13          MR. SCHWAB:  And I'm not contesting effect on the

14   listener.  What I'm saying is if it's being introduced for

15   the purpose of proving that these statements were provided to

16   him, these warnings were made to him, that itself is hearsay.

17          The introduction of evidence that a person not

18   testifying in Court made a statement, that is hearsay.

19          THE COURT:  Understood.

20          MR. FANSLER:  Your Honor, just to add context to

21   that.  I mean, these statements were made, and the Defendant

22   hears them, he responds to them, he admits hearing them, he

23   shows -- he responds and zooms in on the signs after getting

24   these directives.

25          And, again, if we wanted to go clip-by-clip, I

1    would have loved to hear this objection in advance, because

2    we could have talked about the clips the Government plans to

3    use, and discussing these could have come in that way.

4            But I think it will be clear once we show the

5    clips during the trial the effect they had on Mr. Cordova.

6            THE COURT:  Okay.  Just a second.

7        (Pause)

8            THE COURT:  Okay.  Well, I'm going to find that

9    it's 8031.  It's a statement describing or explaining an

10   event or condition made while perceiving the event.

11           So as the officers are perceiving the event that

12   your client purportedly created, then that's an 8031 presence

13   and suppression.  You can't do that.  That's illegal.  This

14   is against the law.

15           So those are statements describing or explaining

16   an event or condition under 8031.

17           So to the extent they are hearsay, I believe that

18   exception would cover the statements of the officers.

19           MR. SCHWAB:  I would just reserve that for when

20   you see more of this video and the context, and whether it's

21   within that or it's just simply "look at this sign," which is

22   not an observation, but a direction in that statement.

23           THE COURT:  Very good.  And those are good

24   objections.

25           MR. SCHWAB:  Thank you, Your Honor.

1          THE COURT:  Overruled.

2          MR. FANSLER:  I'll start the video over.

3       (Video played in open Court)

4          THE COURT:  Was the woman in the upper left

5    associated with the event, or just a bystander?

6          MR. FANSLER:  Associated with the event.

7          THE COURT:  Okay.

8          MR. FANSLER:  A piece of paper.  So he ignored it,

9    as he planned to do all along.

10          Finally, between 3:00 and 4:00 p.m., after at

11   least 3 hours and 13 minutes filming from outside the office,

12   he committed the crime he went there to commit.  He walked

13   inside while continuing to live stream, as he had planned to

14   do all along.

15       (Video played in open Court)

16          MR. FANSLER:  Mr. Cordova got the Court case he

17   wanted.  Mr. Cordova intended to commit a crime.  He set out

18   to commit one that day, and he did, because he viewed the

19   First Amendment as a license to ignore every sign and every

20   officer.  It is not that type of license.

21          So he got two violation notices.  They match the

22   two counts against him in this case.  Count 1 is for non-

23   compliance with official signs and lawful directions.  Count

24   2 is for taking photographs where prohibited, and a space

25   occupied by an agency.

1          This is a simple case.  Proof of each element is

2    on the video that Your Honor will see.

3          The Defendant made one long confession, and he

4    posted it to YouTube.  That confession proves his guilt

5    beyond a reasonable doubt on both counts.

6          Thank you.

7          THE COURT:  Leigh, do we have an actual criminal

8    file?  I don't have that.  Is it an information, or just a

9    ticket or citation?

10         MR. FANSLER:  There's a criminal information with

11   two counts.

12         THE COURT CLERK:  Your Honor, I can pull the

13   information for you.

14         THE COURT:  Usually we have at least a yellow

15   folder that has the original information and other potential

16   documents.  If you could print that out?

17         THE COURT CLERK:  Okay.

18         MR. FANSLER:  I believe it's ECF 3, if that's

19   helpful.

20         THE COURT:  ECF 3.  Thank you.  All right.  Mr.

21   Schwab?

22         MR. SCHWAB:  Your Honor, I don't know how you

23   operate your courtroom.  May I reserve my opening for after

24   the People's presentation?

25         THE COURT:  Yes, you may.

1            MR. SCHWAB:  Thank you.  I'd prefer to do that,

2   Your Honor.

3            THE COURT:  Please call your first witness.

4            MR. FANSLER:  Your Honor, the Government calls

5   Commander Douglas Whiles.

6            THE COURT:  Thank you.

7        (Pause)

8            THE COURT:  So did you guys agree on sequestration

9   of witnesses?

10           MR. FANSLER:  We did not discuss that.

11           THE COURT:  Okay.

12           MR. SCHWAB:  There was no discussion of it, but I

13  would prefer -- I would ask for an order on sequestration,

14  Your Honor.

15           THE COURT:  Any objection?

16           MR. FANSLER:  No.

17           THE COURT:  Fine.  That will be the order of the

18  Court.  Come on forward.

19           THE COURT CLERK:  If you'll please have a seat in

20  the witness stand.  Please raise your right hand.

21           Do you solemnly swear or affirm that the testimony

22  you shall give in this matter now before the Court shall be

23  the truth, the whole truth, and nothing but the truth, and

24  this under the pains and penalties of perjury?

25           MR. WHILES:  I do.

1          THE COURT CLERK:  Thank you.

2     Whereupon,

3                    DOUGLAS WHILES

4     was duly sworn.

5          THE COURT CLERK:  Please be seated in the witness

6 stand.  I'm going to ask you to scoot all the way up to that

7 microphone.  Your chair doesn't roll, so you'll have to --

8          THE COURT:  Yeah, and I'll remind everybody.  We

9 actually sought a court reporter.  There are so many trials

10 occurring in the courthouse today that we don't have a court

11 reporter.

12          So if you want to be on the record, you have to be

13 near a microphone.  Okay?

14                 DIRECT EXAMINATION

15     BY MR. FANSLER:

16     Q.   Good morning.

17     A.   Good morning.

18     Q.   Would you introduce yourself and spell your  name

19 for the record?

20     A.   My name is Doug Whiles, it's W-H-I-L-E-S.

21     Q.   And where do you work?

22     A.   For the Federal Protective Service, Department of

23 Homeland Security in the Lakewood Command here in the Denver

24 area.

25     Q.   What's your title in the Lakewood Command?

1        A.    Area Commander.

2        Q.    How long have you been with the Federal Protective

3   Service?

4        A.    Since December of 2015.

5        Q.    How about in law enforcement?

6        A.    Since March 11, 1996.

7        Q.    Before joining law enforcement did you also serve

8   in the military?

9        A.    I did.

10        Q.    What's your -- you said you're Area Commander.

11   What's your area of command?

12        A.    Pretty much everything west of I-25 in the Denver

13   area.

14        Q.    Does that include the Social Security

15   Administration office in Littleton, Colorado?

16        A.    It does.

17        Q.    As part of your duties have you also been to other

18   Social Security offices in the Denver area?

19        A.    I have.

20        Q.    When does Federal Protective Service have

21   jurisdiction over a building?

22        A.    If it's owned or leased by GSA, the General

23   Services Administration.  We have the responsibility to

24   provide law enforcement services at those facilities.

25        Q.    And is the Social Security office in Littleton

1    owned or leased by General Services Administration?

2         A.   Yes.

3              MR. SCHWAB:  Objection, Your Honor.  I'd ask for

4    more foundation for how he has knowledge of the lease.

5              THE COURT:  Go ahead.  More foundation --

6         BY MR. FANSLER:

7         Q.   How do you know whether buildings are under GSA

8    authority?

9         A.   We maintain a database in conjunction and

10   cooperation with GSA of all the buildings that they own or

11   operate that we have jurisdiction and a responsibility to

12   provide services for.  It's called -- there's a number of

13   databases out there.

14             The one that I use predominantly is called MIST

15   and it has a list of all the buildings in the country broken

16   down by region, then broken down by command, which buildings

17   are GSA owned and operated.

18        Q.   And is the Social Security office in Littleton one

19   of those buildings?

20        A.   Yes.

21        Q.   And that's at -- do  you know the exact address?

22        A.   8000 South Park.

23        Q.   I'm going to turn your attention to August 2nd,

24   2022.  Where were you at in the morning of that day?

25        A.   I was at the range -- the firing range.

1      Q.   Did something happen to cause you to leave the

2  range that day?

3      A.   Yes.

4      Q.   What happened?

5      A.   I received a phone call from one of my inspectors

6  advising that they had a situation at the Social Security

7  office, 8000 South Park, where some First Amendment auditors

8  were attempting to film inside the facility.  They had been

9  asked to leave, and were refusing.  According to my

10  inspector, the situation was escalating.

11      Q.   When you arrived did you encounter an individual

12  you later found out to be named Christopher Cordova?

13      A.   I did.

14      Q.   Do you see him in the courtroom today?

15      A.   Yes.

16      Q.   Can you point to him and describe just something

17  about him for the record?

18      A.   Yes.  Gray suit, beard, mustache, sitting right

19  here.

20          MR. FANSLER:  Your Honor, the Government would

21  just ask that the record reflect that the witness identified

22  the Defendant, Christopher Cordova, as the individual --

23          THE COURT:  It will so reflect.

24      BY MR. FANSLER:

25      Q.   When you arrived did you see individuals recording

1  video?

2      A.   I saw individuals with cameras.  Yeah, I'm not

3  sure if they were recording at the time or not.

4      Q.   How many individuals?

5      A.   Two for sure.  Mr. Cordova and then another

6  identified -- only known to me as Sweet Tea.

7      Q.   Did you later see two videos from that day posted

8  to YouTube?

9      A.   I did.

10      Q.   Did those videos show the Social Security office

11  as it looked on August 2nd, 2022 when you were there?

12      A.   It was an accurate reflection, yes.

13      Q.   And they also show events that occurred on that

14  day?

15      A.   Yes.

16      Q.   And in those videos -- were you able to view them?

17      A.   Not in their entirety, but bits and pieces of both

18  of them.  Yes.

19      Q.   Did those videos show the individuals you saw with

20  camera equipment that day?

21      A.   Yes.

22          MR. FANSLER:  The Government would offer into

23  evidence Government Exhibit 1, which has been stipulated --

24  at least as to admissibility with the hearsay objections

25  noted.  And Government Exhibit 4 at this time, which are

1    those two videos that the witness has just talked about.

2            THE COURT:  Response?

3            MR. SCHWAB:  Yeah, Your Honor.  As discussed

4    earlier for Exhibit 1, we have stipulated to it with the

5    exception of those hearsay objections.  For Exhibit 4, I

6    don't know what -- where he was present for, and my

7    understanding --

8            THE COURT:  When who was present?

9            MR. SCHWAB:  The witness.

10           THE COURT:  Okay.

11           MR. SCHWAB:  He can testify to those moments that

12   he visually watched, but to say I watched the video and

13   therefore I know its contents, I think that's hearsay.  He

14   doesn't have personal knowledge of most of the video.

15           He only watched snippets, but certainly he only

16   would have knowledge of those moments when he actually was

17   visually watching that moment.  Any time before he showed up

18   he has no knowledge of and can't offer any evidence as to the

19   authentication or --

20           THE COURT:  Authenticity?

21           MR. SCHWAB:  Yeah.

22           THE COURT:  Yeah, that's undoubtedly true. So what

23   is relevant to this witness' testimony would be over those

24   matters that he saw or perceived.

25           Unless you qualify him as an expert, he wouldn't

1    have foundation to testify about a video and describing in

2    that video whether things are lawful or unlawful, so you'd

3    have to qualify him as an expert if you want him to render

4    those opinions.

5         MR. FANSLER:  Your Honor, the video is posted

6    online.  It's posted publicly.  He can view all parts of the

7    video.  He was there and observed that setting and how things

8    looked.  The video -- and I think Your Honor will see this,

9    it's -- they're recording at the same time, so it shows

10   different camera angles of the same event.

11        I think it's just like any other video that a

12   witness who can say it's true and accurate, that it reflects

13   what it looked like that day --

14        THE COURT:  Right, and it can be used as a

15   demonstrative too.  So you could take a witness through a

16   video if the video is accurate and say this is where this

17   part of the Social Security building is.  This is where --

18   that is fine.  So it depends on the use that's being made.

19   So I'll let you reverse that objection.

20        I'll admit it provisionally, but if there are uses

21   that you make of it that -- to which you object you can renew

22   your objection.

23        MR. SCHWAB:  And then I would object as it was not

24   disclosed as a demonstrative exhibit either.  It was

25   disclosed for this purpose, and my planning was under the

 1  correct understanding that he did not have personal knowledge

 2  to much of this video.

 3          THE COURT:  Okay.  Understood.

 4          MR. SCHWAB:  And I'd object to the admission of it

 5  for any purpose on that basis.

 6          THE COURT:  Thank you.  Overruled.

 7          MR. FANSLER:  Did we admit the -- I guess I want

 8  to formally move for admission of Government Exhibit 4.

 9          THE COURT:  I think you already did, and I'm

10  admitting it.  By the way, I'm not sure the video would be

11  hearsay because it's not an oral, written, or non-verbal --

12          MR. SCHWAB:  I didn't actually say -- I mean it is

13  hearsay for statements made in it for the truth of the

14  matter.  No, I was actually speaking to authentication.  He

15  doesn't -- and knowledge.  He doesn't have the knowledge.  He

16  wasn't present.

17          THE COURT:  So laying a foundation for the fact

18  that this is true and accurate.

19          MR. SCHWAB:  Sure, and him saying I watched it

20  later, that's not sufficient.  He has to have been present to

21  say yes, these are the conditions.

22          THE COURT:  Well, so if he can describe in the

23  video that this is the office then under any condition I

24  would -- do you actually challenge authenticity though?

25          MR. SCHWAB:  I challenge his knowledge and the

1    ability to get this video in through him.

2              THE COURT:  Right.

3              MR. SCHWAB:  He's not been disclosed as an expert.

4    So he can't speak to that.  He didn't show up for over an

5    hour of recording, and clearly hasn't even watched most of

6    it.

7              THE COURT:  But who took the video we're about to

8    see?

9              MR. SCHWAB:  An individual who is not a witness.

10             MR. FANSLER:  Your Honor, if I can, I guess, just

11   add to that.  The videos were taken, one by the Defendant,

12   one by an individual that was with him.  I think the

13   Government cited in its trial brief, and I think the case law

14   is clear on this point, that anyone who views a video on a

15   public website can testify to its authenticity.

16             So the extent he's raising that because it's on a

17   website he can't authenticate it somehow through this witness

18   just is not in accord with the case law --

19             THE COURT:  No, I agree the origin of the -- of

20   where you found the video is not relevant.  The relevance is

21   does this witness have personal knowledge of the content,

22   such as I am familiar with this building, I've been in this

23   building 50 times.  This is the building.  This was August

24   2nd.

25             Was I there at that precise moment that this part

1   or that part was filmed?  I don't think that's necessarily

2   required in order to establish that the video is authentic.

3   So it's admitted.

4        BY MR. FANSLER:

5        Q.   I want to play the video from your arrival,

6   Commander Whiles, Government Exhibit 1.  I'll quote the times

7   because I'm going to play the volume from Government Exhibit

8   1 running from 1:33:0 to 1:33:55 in Exhibit 1.  In Exhibit 4,

9   that would be from 1:30:59 to 1:31:54.  The audio will come

10  from Government Exhibit 1, which is the Defendant's own

11  video.

12       (Video played in open Court)

13            THE COURT:  What now?

14            MR. SCHWAB:  So first of all, all the videos that

15  have been produced are one image, and this has never been

16  produced to me so I don't know -- I don't actually know where

17  -- are these both videos that Mr. Cordova took?  Is this one

18  video that Mr. Cordova took and one that is Exhibit 4?

19            THE COURT:  Well, let me ask just as a blanket

20  question, is everything you're going to show me today -- any

21  type of evidence -- has already been produced to the Defense?

22            MR. FANSLER:  All of it has been, Your Honor.

23  Both of these are public videos we actually downloaded from

24  the website, both Mr. Cordova's video, which is Government

25  Exhibit 1, and Sweet Tea's video, which is Government Exhibit

1  4 on the right.  Just for the Court's convenience we put them

2  on to play them side by side.

3          THE COURT:  That's fine, as long as the material

4  has all been produced you can rearrange it however you want.

5          MR. FANSLER:  Yeah.

6          MR. SCHWAB:  I mean, I think for presentation

7  purposes in an oral argument, sure.  I think for presentation

8  to a witness it's a little more iffy.

9          THE COURT:  I don't know of any rule against it.

10         MR. SCHWAB:  Okay.

11         THE COURT:  Overruled.

12         MR. FANSLER:  Can you re-start it please?

13     (Video played in open Court)

14     BY MR. FANSLER:

15     Q.   Commander Whiles, what did you do after that

16  initial interaction?

17     A.   I went inside and spoke with the PSO, my

18  inspectors that were on scene, as well as -- there was a lot

19  going on in there.  I talked to a lot of people.  Talked to

20  the facility manager who gave me access to the surveillance

21  video footage, reviewed that.  Just got everybody's

22  perspective on what had taken place prior to my arrival.

23     Q.   Were there other Federal Protective Service

24  officers on the scene when you arrived?

25     A.   There were two.

1      Q.    Who were those individuals?

2      A.    Inspector Doug Pritchard and Inspector Oscar

3   Ramos.

4      Q.    Does Federal Protective Services also use contract

5   security officers?

6      A.    We do.

7      Q.    Were Federal Protective Service contract security

8   personnel also present when you arrived?

9      A.    Yes.

10      Q.    As part of Federal Protective Services agreements

11   with contract security officers did they have authority to

12   enforce rules and restrictions in that building?

13      A.    Yes.

14      Q.    What gives them that authority?  Is there a

15   contract or is there something else?

16      A.    Yes, there's a contract between their agency and

17   FPS.

18      Q.    Is there -- they have authority to do some things

19   and not others?  Can you describe that?

20      A.    Yes, they don't have powers of arrest necessarily,

21   but they do -- they are equipped with the equipment,

22   handcuffs, to detain people if they're violating laws.

23      Q.    Do you recall the names of the Federal Protective

24   Service contract security personnel that were there when you

25   arrived?

1    A.   One for sure, Dave Williams.  I'm not sure of the

2  other guy's name.

3    Q.   Would you recognize him if you saw a photo?

4    A.   I certainly would.

5    Q.   After that initial interaction did you later

6  inspect the signs that had been posted?

7    A.   I did.

8         MR. FANSLER:  I'm going to show him Government

9  Exhibit 3 to admit it.  Usually I wouldn't publish it because

10  of a jury.  I don't know how Your Honor wants to do that.

11         THE COURT:  Well, you don't have to ask to publish

12  because I have the book in front of me.  So -- but it's not

13  admitted, you have to lay the foundation.

14         MR. FANSLER:  It's not admitted, right.

15    BY MR. FANSLER:

16    Q.   I'm going to just show you Government Exhibit 3

17  and then ask you a few questions.  Do each of those photos

18  show signs that were posted on August 2nd, 2022 at the Social

19  Security office?

20    A.   Yes.

21         MR. SCHWAB:  Objection, Your Honor.  Leading.

22         THE COURT:  Just ask him what are those.

23    BY MR. FANSLER:

24    Q.   Commander Whiles, do you recognize those pages you

25  just looked through?

1       A.    Yes.   That signage was posted at the Social

2   Security office on that date.

3       Q.    Do these photographs truly and accurately reflect

4   the signs that were posted that day?

5       A.    Yes.

6       Q.    That you observed with your own eyes?

7       A.    Correct.

8             MR. FANSLER:   The Government moves to admit

9   Government Exhibit 3.

10            THE COURT:   Any objection?

11            MR. SCHWAB:   No objection, Your Honor.

12            THE COURT:   They'll be admitted.

13      BY MR. FANSLER:

14      Q.    Commander Whiles, I'm going to play one more clip

15  and then ask you some questions about it.   This clip is from

16  Government Exhibit 1 on the left side running from 1:34:01 to

17  1:35:10.   On the right side it's going to be from Exhibit 4

18  from 1:32:00 to 1:33:09.   Again, the audio comes from

19  Government Exhibit 1, which is the Defendant's video.

20      (Video played in open Court)

21      BY MR. FANSLER:

22      Q.    What are you doing in that video?

23      A.    Reading the signage that's posted on the windows

24  of the foyer there.

25      Q.    I'm going to show Government Exhibit 3-2.   Was

1   that sign in the video that we just watched?

2          A.   It was.

3          Q.   And is that the one you looked at?

4          A.   Yes, sir.

5          Q.   Can you just read what it says and what you saw

6   that day?

7          A.   Sure.   It says, "Social Security Administration

8   warning.   Photography and videography prohibited.   Federal

9   law and SSA policy prohibits taking pictures or video inside

10  SSA offices without the expressed written consent of an

11  authorized official of the Agency.   These rules apply to all

12  devices with camera and video capability."

13         Q.   Before we get to what goes on inside the office I

14  want to direct your attention to the posted signs in more

15  detail.   As part of your responsibilities do you visit

16  multiple Social Security Administration offices in the Denver

17  area?

18         A.   Yes.

19         Q.   Have you seen no photography signs posted at other

20  Social Security offices?

21         A.   All of them.

22         Q.   Who developed the signs that were posted at the

23  Social Security office that day?

24         A.   I'm not sure who develops them, but I know where

25  they get them.   They have a -- their central office -- I'm

1    not sure of the terminology they use, but their headquarters

2    division has an internet website where they post this

3    signage, or they make it available to all the branch offices

4    to go retrieve that signage and post it.  It's required

5    posting at all facilities.

6         Q.   So you're understanding is it's an official sign

7    from the headquarters.

8         A.   Absolutely.  Yes.

9              MR. SCHWAB:  Objection, Your Honor.  That was

10   leading.  It's an official sign, right?

11             THE COURT:  Okay.  So as you know, the rules of

12   evidence permit leading questions for the purpose of

13   developing testimony.  In a bench trial there's going to be a

14   lot more leniency than there would be a jury trial, so for

15   the purpose of developing testimony under the rule -- which

16   is 611 -- leading questions should not be used on a direct

17   exam except as necessary to develop the witness' testimony.

18   I find that that's an appropriate use of a leading question

19   and overrule the objection.

20        BY MR. FANSLER:

21        Q.   Did I hear you correctly?  You said it's

22   classified as a security sign?  Did you just say --

23             MR. SCHWAB:  Objection, Your Honor.  Misstating

24   any testimony.

25             MR. FANSLER:  I thought he just said that.

1              THE COURT:  Well, so yeah, I'll let the witness

2    clarify.  What is the sign?  How would you classify it?

3              MR. FANSLER:  I can re-ask it.

4         BY MR. FANSLER:

5         Q.   I thought I heard you say that.

6         A.   I didn't say that.

7         Q.   Okay.  Does the Social Security Administration

8    have different categories of official signs?

9         A.   They do.

10        Q.   What are those categories?

11        A.   I don't know them all.  There's a group called

12   occupational signage, directional signage, security signage.

13   There's at least one more, I don't recall the category of

14   that.

15        Q.   Do you know what category this no photography sign

16   is in?

17        A.   Yes, these fall under the security signage.

18             THE COURT:  What would the masking signs fall

19   under?

20        A.   I don't know.  They have their own category

21   actually.  I think COVID has its own category.

22        BY MR. FANSLER:

23        Q.   In your experience and observations at different

24   Social Security offices where are these signs posted?

25        A.   Well, this one's on the front window of the

1  vestibule as you come in.

2          THE COURT:  That is not relevant.  We've already

3  seen all the signs that were posted, right?  So is it

4  relevant anywhere else they're posted, or just the ones we

5  know were here in the path of Mr. Cordova?

6          MR. FANSLER:  That's a good --

7          THE COURT:  So let's just focus on what is really

8  at issue in the case.

9          MR. FANSLER:  I will do that.  Thank you, Your

10 Honor.

11      BY MR. FANSLER:

12      Q.   I'm going to direct your attention back to August

13 2nd, 2022.  I'll play a clip first from Government Exhibit 1

14 at 1:57:35.  This one is a little bit of a longer clip to

15 2:02:38.  On the right side it's going to be from Government

16 Exhibit 4 at 1:55:34 to 2:01:10.  Audio is from Government

17 Exhibit 1.

18      (Video played in open Court)

19          THE COURT:  Why?

20          MR. SCHWAB:  Now it's hearsay of he's saying what

21 somebody else said.

22          THE COURT:  Right.  So do you know why we have a

23 rule against hearsay?

24          MR. SCHWAB:  It's to -- it's for the purposes of

25 trustworthiness.

1          THE COURT:  Correct.

2          MR. SCHWAB:  Yeah.

3          THE COURT:  And if we have the actual words then

4   this would clearly be an 807 residual exception.

5          MR. SCHWAB:  Sure.  And I'm not saying that his

6   words are hearsay.  I'm saying him repeating someone else's

7   statement that could have very well been brought in to talk

8   today -- testify today -- that statement --

9          THE COURT:  Whose words was he repeating?

10          MR. SCHWAB:  He was repeating somebody that worked

11   in Social Security Administration.

12          THE COURT:  I see.  Okay, so it's hearsay within

13   hearsay is what you're saying.

14          MR. SCHWAB:  Yes, Your Honor.

15          THE COURT:  Okay.  So I don't find any -- under

16   807 I'm going to allow any original statements made on these

17   videos because they're simply trustworthy, we don't have to

18   worry about whether they were actually made, or even what the

19   words were.  We have it recorded.

20          There is a proper objection as to when someone

21   repeats words that another person said.  What's your response

22   to that objection?

23          MR. FANSLER:  A few things, Your Honor.  The

24   Defendant all along is asking both for FPS' interpretation of

25   the rule and why Social Security has that rule.  He's coming

 1   out and explaining it to them.  That gives the Defendant

 2   knowledge and notice, which is something he expressly asked

 3   for.  It has an effect on him because then he decides whether

 4   he's going to follow that --

 5            THE COURT:  Right, but don't you think the signs

 6   provide sufficient notice without the oral commands of

 7   anybody?

 8            MR. FANSLER:  I mean the fact is that the

 9   Defendant throughout is making statements that he wants more,

10   and more, and more information, and so I don't really want to

11   give him the profit of keeping out admissible statements that

12   he keeps asking for.

13            THE COURT:  I'll grant the objection to this

14   extent, that it refers to matters that someone in the video

15   repeats what someone else said, because that is hearsay.  I

16   will compartmentalize and strike that.

17            MR. SCHWAB:  I appreciate it, Your Honor.

18            THE COURT:  All right, thank you.  But otherwise,

19   the video can be played.  I'll just disregard when somebody

20   says hey somebody else said.

21            MR. FANSLER:  Understood, thank you.

22       (Video played in open Court)

23       BY MR. FANSLER:

24       Q.   Commander Whiles, what did you give him in that

25   video?

1       A.   A copy of 41 CFR 102-74.420.

2       Q.   I want to show you now what's marked as Government

3    Exhibits 8 and 9.  Do those videos truly and accurately show

4    the way that the Social Security Administration office looked

5    on August 2nd?

6       A.   Yes.

7       Q.   And do the screen shots truly and accurately

8    reflect what you could see on the YouTube web page that you

9    have viewed?

10      A.   Yes.

11           MR. FANSLER:  Your Honor, the Government would

12   move to admit Exhibits 8 and 9, the screen shots from the

13   YouTube videos that are already admitted.

14           THE COURT:  Any objection?

15           MR. SCHWAB:  No objection, Your Honor.

16           THE COURT:  Admitted 8 and 9.

17           MR. FANSLER:  I want to show the witness

18   Government Exhibit 9, page 2.

19      BY MR. FANSLER:

20      Q.   Are there markings on that document?

21      A.   There's a highlighted portion, yes.

22      Q.   I'm going to show you Government Exhibit 14.  Do

23   you recognize this?

24      A.   I do.

25      Q.   What is it?

1      A.   It's a copy of the CFR rules and regulations

2   governing conduct on Federal property.

3      Q.   Does it match the one you gave -- the document you

4   gave from that day?

5      A.   Yes.

6      Q.   And can you just circle the area you highlighted

7   on that regulation?  Do you recall what that area -- what the

8   highlighted area related to?

9      A.   I do.

10      Q.   What did it relate to?

11      A.   It was the portion that talks about when

12   photography and videography is prohibited in the Federal

13   space.

14      Q.   I think that's good enough.  We don't need to see

15   the notation.

16          THE COURT CLERK:  I'm a little bit concerned,

17   Counsel, that now [inaudible] and that kind of looks like

18   where we are right this second.  I may have to ask IT to come

19   [inaudible].

20          THE COURT:  Wouldn't be the first time.  We have

21   IT up here every single trial.

22          THE COURT CLERK:  Let me go ahead and make that

23   call.  Actually, before I do that would you mind just

24   plugging that and let me disconnect the router entirely and -

25   -

1          (Pause)

2               MR. FANSLER:  I do have an area that can kind of

3     be some general questions for just a couple minutes.

4               THE COURT:  Please proceed.

5          BY MR. FANSLER:

6          Q.   Commander Whiles, we've watched a few clips now.

7     Why didn't you just give Mr. Cordova a ticket when you

8     arrived?

9          A.   It's really not the way I like to do business.  I

10    like to give people the opportunity to do the right thing,

11    educate them, explain the situation, give them the

12    opportunity to follow the rules and the laws.

13         Q.   And why do you do that?

14         A.   I think it's good police work.  I just think a lot

15    of times people are, I guess, misled or have a misconception

16    of what's okay and what's not.  So I believe in education

17    versus incarceration, if at all possible.

18         Q.   You discussed having phone calls.  Who did you

19    talk to on the phone that day?

20         A.   I talked to a lot of people that day, so

21    originally I talked to the District Commander and advised him

22    of what was going on.  Then to his boss, the Acting Deputy

23    Regional Director at that time.

24              I talked to the Assistant U.S. Attorney's office.

25    I talked to our legal staff in headquarters in D.C.  Most of

1    those people multiple times, multiple phone calls explaining

2    the situation as it developed, and getting guidance from

3    them.

4         Q.   We don't need to display this.  Can you turn to

5    Government Exhibit 9-3?  Can you describe what 9-3 shows?  I

6    think it's actually 8-3.  So Exhibit 8 -- tab 8.  It should

7    be page 3 of 11.

8         A.   So this is the one you're talking about?

9         Q.   That's the one.  Yeah.  Can you describe what you

10   see in that picture?

11        A.   Yes, this looks like an image taken in the

12   vestibule looking inside the Social Security office at 8000

13   South Park.

14        Q.   What kinds of business happen in that area?

15        A.   All kinds of personal business is being taken care

16   of there.  People have to log in on a kiosk, put in some

17   personal information there.  There are discussions being had

18   at all the windows you can see on the back wall of this

19   photo.  There's conversations taking place there of a

20   personal nature, as well as often times in the seating it's

21   just this side of those windows on the back wall.  People

22   talking to each other about their business, their attorneys,

23   whoever may be involved in their particular situation.

24        Q.   What reasons, in your observations, what reasons

25   do people go to a Social Security office?

1          A.    Social Security benefits or lack thereof,

2   depending on their situation.

3          Q.    And so that photo that we just looked at, there's

4   -- in the middle of the page there's something marked D.

5   What's on the other side of that service window?

6          A.    Generally speaking, or in this picture?

7          Q.    In this picture.  I guess the people that we see

8   there with the white shirt and the other people sitting down,

9   who are those people?

10         A.    Customers of the Social Security office.  Then on

11   the other side are the Social Security employees.

12              THE COURT:  Could we just get a stipulation from

13   you that citizens go into the Social Security office in order

14   to address benefits from Social Security Administration?

15              MR. SCHWAB:  I mean, I would assume that they do

16   to some degree, but I don't know.  I certainly --

17              THE COURT:  You're not old enough to know.

18              MR. SCHWAB:  -- never have been a Social Security

19   Administrator or employee.  I think an employee that could

20   testify to that would have been valuable.

21              THE COURT:  Sure.

22              MR. SCHWAB:  And I don't know what his personal

23   knowledge as to the operations and business conduct is.

24   Obviously there must be something related to Social Security,

25   but are people applying for new numbers?  I don't know.

1           THE COURT:  Does it matter for purposes of the

2    trial?

3           MR. SCHWAB:  I don't think it actually matters.  I

4    don't think this testimony is really relevant.

5           THE COURT:  Yeah, I don't think it is either.

6    Well, it's --

7           MR. SCHWAB:  I don't think it's relevant to any

8    element of either of these offenses.

9           THE COURT:  And I'm going to accept -- having been

10   an attorney for Social Security 14 years earlier in my career

11   -- that what goes on in a Social Security office are citizens

12   who come in to address their relationship with the Social

13   Security Administration, including Social Security numbers,

14   Social Security benefits, questions about benefits, questions

15   about the program.  So I will accept that.

16          MR. FANSLER:  Is that working again?  No, okay.

17   That was my couple minutes of content while I was waiting for

18   the system.

19          THE COURT:  Very good.  IT is not here yet?

20          THE COURT CLERK:  They may be, Your Honor.  Let me

21   check.

22      (Pause)

23      BY MR. FANSLER:

24      Q.   I just want to play one clip here before we have a

25   couple of concluding questions.  That clip is from -- let me

1  lead into it.  During your observations that day how did

2  Social Security Administration customers react to Mr. Cordova

3  filming?

4        A.    There were a variety of reactions.

5        Q.    Not the words they used, just non-verbal.

6        A.    Some people were visibly uncomfortable with what

7  was going on.  There was a pretty large police presence at

8  times.  Some people were concerned, reluctant to come inside

9  because of the heavy police presence.  Other people were, you

10  know, visibly shielding their faces from the cameras.  Maybe

11  even exchanging comments with the videographers as they were

12  coming or going from the building.

13        At one point there was actually a confrontation

14  outside between somebody who was filming and one of the

15  customers who was exiting.  That caused several people to go

16  outside and -- including myself -- to try to -- for different

17  reasons.  I'll speak to why I went outside.  To de-escalate

18  the situation because it was seeming to get pretty heated in

19  a verbal exchange.

20        Q.    I just want to play one clip here, which is

21  Exhibit 1, starting at 2:38:42.

22        (Video played in open Court)

23        BY MR. FANSLER:

24        Q.    Was that one of the interactions you were

25  discussing?

1        A.    Yes.

2        Q.    I want to direct your attention now to your

3   interactions with Mr. Cordova.

4              MR. FANSLER:  Before we play this, Government

5   Exhibit 1 from 3:09:43, if Defense counsel wants to object.

6   This is just the front -- what's going to happen here, this

7   is a clip of another officer when Commander Whiles is present

8   giving a command.  Just to note, the Defendant had notice

9   from multiple officers -- the non-hearsay purpose of notice

10  from multiple individuals and not just this officer.  So

11  that's what I want to play, just a four second clip showing

12  that notice from another officer.

13        (Video played in open Court)

14        BY MR. FANSLER:

15        Q.    Who is in that video?

16        A.    Inspector Ramos.

17        Q.    Were you also present at that time?

18        A.    I don't know.

19        Q.    You can't see it from that clip.  Did you

20  personally ever give Mr. Cordova an order not to film inside

21  the Social Security office?

22        A.    I did.  Multiple times actually.

23        Q.    I'm going to show you a couple of clips.  I'm

24  going to show two of them and then ask you questions about

25  them.  So starting at 2:13:36 to 2:13:55.  This is just from

1    Government Exhibit 1.

2         (Video played in open Court)

3         BY MR. FANSLER:

4         Q.   Mr. Cordova in that video -- let me -- do you know

5    whose voice that is in that video?

6         A.   That sounds like Mr. Cordova.

7         Q.   And he called it a directive in that video, do you

8    agree?

9         A.   Yes.

10             THE COURT:  Does he agree that he said it or does

11   he agree that it's a directive?

12        BY MR. FANSLER:

13        Q.   Do you agree that he -- did you hear him say that

14   it was a directive?

15        A.   I did.

16        Q.   The last clip I want to play is Exhibit 1 from

17   3:13:30 to 3:14:57 on the left side with volume.  On the

18   right side is going to be Exhibit 4 at 3:11:29 to 3:12:56.

19             (Video played in open Court)

20        BY MR. FANSLER:

21        Q.   Commander Whiles, what did you do after Mr.

22   Cordova filmed inside the Social Security office?

23        A.   Took him into custody.  Advised him he was under

24   arrest and escorted him to the back room.

25        Q.   Who was the arresting officer?

1       A.    Me.

2       Q.    Did you seize any physical evidence from him?

3       A.    I did.

4       Q.    What did you take?

5       A.    His cell phone that he was filming with.

6             MR. FANSLER:  No further questions, Your Honor.

7             THE COURT:  Cross?

8                        CROSS EXAMINATION

9    BY MR. SCHWAB:

10      Q.    Good morning, Mr. Whiles.

11      A.    Good morning.

12      Q.    Did you write a report after this incident?

13      A.    I did.

14      Q.    Do you recall all the statements in it?

15      A.    For the most part, yeah.  Couldn't recite it to

16   you verbatim but I know the general context of the report.

17      Q.    Do you recall describing the location where they

18   were filming for those three hours as the foyer?

19      A.    I don't recall, but that's likely.

20      Q.    If I were to hand you your report do you think

21   that would refresh your recollection?

22      A.    Sure.

23            MR. FANSLER:  Your Honor, to the extent it helps,

24   this is in the Government's exhibit binder too.

25            MR. SCHWAB:  Is it?  Oh, I apologize.  I was going

 1 | to --

 2 |        THE COURT:  Just refer to the exhibit please.

 3 |        MR. FANSLER:  I believe it's Exhibit 13.

 4 |        THE COURT:  So this is only for refreshing your

 5 | memory, and you may look at it to determine what you called

 6 | that area.

 7 |        MR. FANSLER:  Exhibit 12, page 1 and 2.  Or just

 8 | page 1.

 9 |    BY MR. SCHWAB:

10 |    Q.   Just to direct your attention, it's going to be

11 | the fourth paragraph, the fourth line in the middle.  Does

12 | that refresh your recollection?

13 |    A.   Yes.

14 |    Q.   And in your statement did you refer to the area

15 | they were filming in as the foyer?

16 |    A.   Yes.

17 |    Q.   Now earlier you testified that the sign was a

18 | security sign, correct?

19 |    A.   Yes.

20 |    Q.   Where do you know that from?

21 |    A.   I've actually seen the categories, and what signs

22 | fall under which category.

23 |    Q.   Can you list out all of those categories?

24 |    A.   Well, I previously stated I don't know them all

25 | but I can give you the ones that I do recall.

1          THE COURT:  What's the source of the information?

2    Is it a sheet that your agency types up?  Or your knowledge?

3    Is it a policy statement?  Is it a CFR?

4         A.   There was an inquiry as to where these signs

5    officially come from, how each Social Security office obtains

6    them.  That email specifically directed us to the internet

7    website where the signs are available for retrieval.  These

8    particular videography signs were in the security signage

9    folder on that internet website.  So I didn't actually visit

10   that myself, but that was provided as an attachment directly

11   from the website in the email.

12        BY MR. SCHWAB:

13        Q.   So you don't have personal knowledge to its

14   location as a security regulation.

15        A.   I've not been there to retrieve a sign.  Correct.

16        Q.   And you don't know who described it as a security

17   regulation.

18        A.   I couldn't tell you the name but I will also tell

19   you that one of my inspectors was tasked with contacting the

20   facility director at this particular facility asking him

21   where those signs came from.  That's the information that he

22   provided as well verbally, which was --

23        MR. SCHWAB:  Objection, Your Honor.  This is

24   getting into hearsay.

25        THE COURT:  Sure, but is it even relevant?  The

 1  Count 1 says official sign of a prohibitory, regulatory, and

 2  directory nature.  It doesn't say anything about security, so

 3  it's not relevant --

 4          MR. SCHWAB:  Sure, but as to the second -- as to

 5  Count 1 -- one of the two counts says a security regulation.

 6          THE COURT:  Count 2 says a violation of security

 7  regulations, rules, orders, and directives.  So that will be

 8  a matter of law --

 9          MR. SCHWAB:  Sure, and I want to get a little more

10  into that, okay?

11          THE COURT:  Okay.

12      BY MR. SCHWAB:

13      Q.   You're familiar with this Social Security office.

14  You've been there?

15      A.   Yes.

16      Q.   Was there a metal detector?

17      A.   No.

18      Q.   Were there any other security mechanisms in that

19  office?

20      A.   Define a security mechanism.

21      Q.   A mechanism for the security of the individuals

22  entering in or those employees that are present.

23          THE COURT:  HALO camera.

24      A.   There are video cameras, yes.

25          THE COURT:  Locked doors.  Doors you can lock.

1        A.   Security officers, video cameras.

2        BY MR. SCHWAB:

3        Q.   And do you recall if you described in your report

4   the purpose of these signs?

5        A.   The purpose -- did I describe the purpose of those

6   signs?  I don't know.

7        Q.   So let's take a step back.  You said in the moment

8   you received information as to the purpose of these signs,

9   correct?  When you were there you called around and you were

10  told that these were security signs, right?

11       A.   No, not at the time.  No.

12       Q.   No?  Okay, but did you call around to get

13  information as to the purpose of these signs?

14       A.   No, I didn't need to do that.  The purpose of the

15  signs is self-evident when you read them.

16       Q.   And what is the purpose of those signs as you

17  described that day?

18       A.   To prohibit the filming -- or photography or

19  videography in the facility.

20       Q.   Let me put it a different way.  Did you say that

21  you explained to Mr. Cordova that due to the sensitive nature

22  of the conversations that take place in the facility and the

23  prevalence of personally identifiable information within the

24  facility, that's the reason that filming is being prohibited?

25       A.   Yes.

1    Q.    So it was about the personal information.

2    A.    Correct.  I may have been confused about what you

3    were asking me there, but yes.

4    Q.    In your report -- and you can refer back to it --

5    you described the purpose -- the reason for the prohibition

6    on filming is the sensitive conversations that take place in

7    the facility, as well as the prevalence of personally

8    identifiable information, correct?

9    A.    Correct.

10   Q.    You don't write anywhere in here that it's to

11   protect security concerns.  And I'm talking about this report

12   that you generated I assume that same day?

13   A.    I don't think I used the word security in this

14   report at all.

15   Q.    Do you know who placed that particular sign -- the

16   individual that placed the sign in this window?

17   A.    Of course not, no.

18   Q.    Have you seen these exact signs elsewhere?  And I

19   mean in like these are official signs.  Have you seen that

20   sign?

21   A.    Yes.

22   Q.    Who adopted those signs?  Based on your personal

23   knowledge, what individual signed off this sign has been

24   adopted?

25   A.    Well, I don't know the answer to that, but what I

1    do know, as I stated previously, it's required signage at all

2    Social Security offices, and all the ones that I've been to

3    have this signage.

4        Q.   But you can't tell me where the -- what action

5    created the adoption of this sign?

6        A.   No.  A directive from their headquarters is what I

7    assume, but I don't know.

8        Q.   But you don't know.

9            MR. SCHWAB:  No further questions, Your Honor.

10           THE COURT:  Thank you.  Any redirect?

11           MR. FANSLER:  No, Your Honor.

12           THE COURT:  You may step down, sir.

13           THE WITNESS:  Thank you.

14           THE COURT:  Do you want to take a break or call

15    your next witness?

16           MR. SCHWAB:  I would appreciate a five minute

17    break, Your Honor.

18           THE COURT:  Okay.

19           MR. FANSLER:  That's fine.  The Government rests.

20           THE COURT:  So we'll begin your case -- do you

21    have a case?

22           MR. SCHWAB:  Your Honor, I was relying on the

23    Government also calling Oscar Ramos.  I was relying on their

24    exhibit list.

25           THE COURT:  Well, he's here.  So you can call him.

1           MR. SCHWAB:  Well, I intend to call him.

2           MR. FANSLER:  Your Honor, we don't have --

3   Inspector Ramos is not here because he wasn't going to

4   testify.  We did file a witness list because we thought we

5   might have two witnesses.  We decided we didn't need to call

6   him --

7           THE COURT:  Well, if it was a will call -- if he

8   was a will call then he's entitled to rely on your will call

9   list.

10           MR. FANSLER:  It wasn't a will call.  It was just

11   this is the proposed witness list.

12           THE COURT:  Did we not do will calls in this case?

13           MR. FANSLER:  No, we just filed these are the

14   possible witnesses.

15           MR. SCHWAB:  I don't believe there was any

16   indication of a possible.  Certainly it's not listed as a may

17   call.

18           MR. FANSLER:  Your Honor, in every case the

19   Government has lots of witnesses and sometimes calls all,

20   sometimes calls some, sometimes -- I don't know --

21           THE COURT:  Well, I mean you didn't have a will

22   call or a may call, you just had your witness list.  You

23   listed 30 minutes for Officer Ramos, so -- let me get a

24   proffer of what you would purport to establish through

25   Officer Ramos to make sure that it's sufficiently relevant.

1          MR. SCHWAB:  Sure.  It's actually his statement.

2    His report that he wrote.

3          THE COURT:  Is that an exhibit?  Because the

4    Officer Whiles' was.

5          MR. SCHWAB:  I'd have to review Exhibit -- it

6    potentially is here.  Yes, it is an exhibit, but I don't

7    believe 12 has been admitted into evidence.

8          MR. FANSLER:  Yeah, Your Honor, we just included

9    all the reports in there just because it is common for

10   defendants to use these for impeachment --

11         THE COURT:  Do you want to move for the admission

12   of 12 and --

13         MR. SCHWAB:  I would move to admit 12.  Yes.

14         THE COURT:  In lieu of testimony?

15         MR. SCHWAB:  You know what?  Hold on.  You know,

16   my preference would be to admit Exhibit 12 for the first six

17   pages.  The remaining six are statements that are people who

18   were never noticed as witnesses here.

19         THE COURT:  Understood.  Six itself is also --

20   that's a security guard.  You don't want --

21         MR. SCHWAB:  I apologize.  Let me -- page one

22   through six -- no, six is the end, I believe, of Mr. Ramos'

23   report.  So the first page would be Mr. Whiles' report.  The

24   second page is -- I'm not completely certain.  It looks like

25   an intake form.  Then pages three through six are Mr. Ramos'

1   report.

2              THE COURT:  So Exhibit 12, pages 1 to 6, have been

3   proffered as an admission in lieu of testimony.  Any

4   objection?

5              MR. FANSLER:  I just need one minute to look at

6   the report, if I can.

7              THE COURT:  Very good.

8         (Pause)

9              MR. FANSLER:  The Government doesn't object to

10  admitting that in lieu of testimony.

11             THE COURT:  Exhibit 12, pages 1 through 6 are

12  admitted.  You ready for your break?

13             MR. SCHWAB:  Yes, Your Honor.  And I would ask for

14  ten minutes.  We're going to -- if the Government is resting

15  I'd ask for a ten minute break.

16             THE COURT:  The Government has rested, and so

17  we'll be in recess for ten minutes.

18             MR. SCHWAB:  Thank you, Your Honor.

19             THE COURT CLERK:  All rise.  Court is in recess.

20        (Recess from 10:26 a.m. until 10:38 a.m.)

21             THE COURT CLERK:  All rise, court is in session.

22             THE COURT:  For the Defense.

23             MR. SCHWAB:  Your Honor, before I make my opening

24  statement I'd like to move under Rule 29 for judgment of

25  acquittal.

1        THE COURT:  Okay, did you want to make argument or

2   not?

3        MR. SCHWAB:  Yes, Your Honor.

4        THE COURT:  Go ahead.

5        MR. SCHWAB:  So we have two counts.  The first

6   issue is that the second count -- I apologize, I keep

7   confusing which count is which.  I don't seem to have that --

8        THE COURT:  Count 1 is failed to comply with

9   official signs.  Count 2 is took video.

10        MR. SCHWAB:  Okay.  As to Count 1, I have several

11   different arguments.  The first is that this is a lesser

12   included of the first.  The -- or the second charge.  You

13   can't violate both independently.  The second one requires a

14   sign because otherwise the rule is that they're allowed to

15   film certainly in certain areas.  We'll get to that in a

16   moment.

17        But they both ultimately rely on the same conduct

18   and should merge.

19        Now additionally, Mr. Cordova can't be charged in

20   the first charge because of the rule of specificity.  The

21   specific governs the general.  Here what we have is that to

22   have violated this secondary -- the second count requires

23   that there have been a sign or regulation.

24        It is more specific.  It says a security

25   regulation.  And that means that this 102-74.420 governs

1    issues of recording and signs related to recording on public

2    property.  The violation of a sign on recording is subject to

3    this and not the other one.

4         So my -- I submit to the Court that these two

5    merge.  And really it makes this second count the operative

6    count.  And ultimately then the question becomes two fold.

7    Was this a security regulation that prohibited Mr. Cordova's

8    recording, and was the area he entered into -- we already

9    heard testimony that first area was a foyer.  In fact --

10        THE COURT:  Well, let's talk about this.  So Count

11   2 would not rely on signage because the CFR says except by

12   permission of the tenant, you can't film in certain areas.

13   That's not dependent on signage.  It's free standing, it's

14   self-executing.  It seems Count 2 then does -- Count 1 then

15   does depend on signage.  So why would -- I don't -- I'm not

16   yet agreeing that 1 is consumed within the other.

17        MR. SCHWAB:  Okay, and let me re-order that

18   argument and I think you'll see where I'm headed.  So Count 2

19   says that persons may enter and take photography.  It doesn't

20   prohibit it.  It says they may, except where security

21   regulations prohibit it, they may enter into spaces occupied

22   by tenant agencies.

23        I would say that that and is exclusive.  So it's

24   spaces occupied by tenants for non-commercial purposes.

25   That's one scenario in which someone can enter into and film.

1    A second is spaces occupied by tenant agencies for commercial

2    purposes with written permission of an authorized official.

3    And an additional option is building entrances, lobbies,

4    foyers, corridors, and auditoriums.

5              Those are three separate bases on which people can

6    film.  It's not all three.  It doesn't have to be all three.

7    It can be any one of those three.

8              THE COURT:  They're disjunctive.

9              MR. SCHWAB:  Yes.

10              THE COURT:  Yes.

11              MR. SCHWAB:  So then the question is if he was

12    solely within a foyer and lobby, then there must be a

13    security regulation, okay?  So what we already heard

14    testimony on is that that area he was in was a foyer.  So

15    then the secondary question is when he enters through those

16    doors, what is the nature of that space.

17              If you turn to Exhibit 12 -- this would be Officer

18    Ramos' statement -- Officer Ramos repeatedly refers to this

19    space as a lobby.

20              THE COURT:  Right, but he doesn't get to define

21    the law for me.  These statements are not binding --

22              MR. SCHWAB:  Sure.

23              THE COURT:  -- on the Court for determining as a

24    matter of law where somebody is at a given moment.

25              MR. SCHWAB:  Sure.  But for matters of perception

1    of what this space is, and what would be reasonable for an

2    individual subject to criminal offense to understand the

3    space to be, Mr. Ramos repeatedly -- at least five or six

4    times in this report -- refers to it as the lobby.  The place

5    that he enters into, if Mr. Cordova -- we told them -- Mr.

6    Cordova if he entered into the lobby he would be subject to

7    arrest.

8                THE COURT:  Have you been to this place?

9                MR. SCHWAB:  I have not.

10               THE COURT:  But you saw the video?

11               MR. SCHWAB: I  have seen the video.

12               THE COURT:  Is there any more possible interior

13   space than what your client entered?

14               MR. SCHWAB:  I do not know, and there's no

15   evidence to say that there is or is not.

16               THE COURT:  Well, from the video is there any more

17   possible interior space than what he entered?

18               MR. SCHWAB:  We've seen other interior space in

19   the video.

20               THE COURT:  You mean the glassed areas?

21               MR. SCHWAB:  Well no, there's other -- well,

22   there's the glassed area. There are certainly doors.  I don't

23   know if there are spaces that people enter into to have

24   private conversations, but throughout all of the discussions

25   --

1              THE COURT:  Okay, so let me ask this.  Did you see

2    anybody doing any kind of transactions in what we've heard as

3    the foyer or vestibule?

4              MR. SCHWAB:  Not that I'm aware of.

5              THE COURT:  Did you see people possibly doing

6    transactions through those glass doors?

7              MR. SCHWAB:  Possibly.

8              THE COURT:  Okay, so the regulation says space

9    occupied by a tenant agency is where you can't go without

10   their permission.  So I would, at least for the moment,

11   unless convinced otherwise, believe that that initial space

12   where most of the filming occurred, was not a space occupied

13   by that tenant.  It was a common area for people to be.

14             Going beyond those doors would be space occupied

15   by a tenant agency because clearly there were transactions

16   going on.  If you actually look at Exhibit 8, first page --

17   tell me when you're there.

18             MR. SCHWAB:  Okay.

19             THE COURT:  Do you see the kiosk that says

20   customer check in?

21             MR. SCHWAB:  Yes, Your Honor.

22             THE COURT:  Do you see a screen evident in the

23   video?

24             MR. SCHWAB:  Sure.

25             THE COURT:  Okay.  So if a person had entered

1   personally identifiable information like a Social Security

2   number and address, other information on that screen, a

3   person videoing from right there could enhance that video and

4   collect information off that screen.  That I believe is a 201

5   to a scientific certainty that that could happen.

6           So what do I do with that?  I mean standing in the

7   lobby you're fine.  Having full access to people's

8   information where a tenant -- I assume GSA owns these

9   buildings and SSA is the tenant -- doing the work of -- that

10  the regulation anticipates would be done inside a government

11  building is a step too far.  That's what I think is going on.

12  And I know you know that too.

13          MR. SCHWAB:  So again, there's -- whether they do

14  work inside of a lobby is not the point.  The point is

15  whether this would be properly understood as a lobby.  And

16  one of the arresting officers did interpret it -- understand

17  it to be a lobby.

18          THE COURT:  Are you in a lobby right now?

19          MR. SCHWAB:  I am not in a lobby right now.

20          THE COURT:  Is there a lobby behind you about 20

21  feet?  Probably we would call that a lobby?

22          MR. SCHWAB:  I would not -- what?  Between the

23  doors?

24          THE COURT:  30 feet --

25          MR. SCHWAB:  I don't know --

1              THE COURT:  Beyond those two doors, would you call

2    that a lobby?

3              MR. SCHWAB:  I don't have -- oh, I would define

4    that as a hallway.

5              THE COURT:  A hallway --

6              MR. SCHWAB:  Or a corridor.

7              The COURT:  A corridor is good.  There you go.

8    But there's no business going on out there, and we don't

9    conduct transactions -- official business in that hallway.

10   We do here.

11             MR. SCHWAB:  And I didn't see any individuals of

12   the Social Security Administration walking around this

13   seating area conducting business either.  Again, this was

14   understood as a waiting room.  As I provided to you in my

15   motion to dismiss, a public waiting room is one definition of

16   a lobby.  One of the officers referred to it as a lobby.

17             And again, this is not a question -- they have to

18   prove beyond a reasonable doubt that this was not a lobby,

19   right?

20             THE COURT:  Sure.

21             MR. SCHWAB:  And I think that there is a

22   reasonable doubt as to the proper classification, and if this

23   was a lobby, whether they were conducting business there is

24   actually irrelevant under this statute.  Once it becomes a

25   lobby then it is subject to this except if there is a

1  security regulation.

2           THE COURT:  I'm equating conducting business with

3  tenant occupancy.

4           MR. SCHWAB:  I understand.  What I'm saying is

5  that these are disjunctive.  So if he -- he has the right to

6  film in a building entrance, lobby, foyer, corridor, or

7  auditorium for news purposes, except where there is a

8  security regulation.  It doesn't have to be all these other

9  things.  It doesn't have to be that he -- because you can't -

10 - A and B cannot be --

11          THE COURT:  Right.

12          MR. SCHWAB:  -- complied with together.  One is

13 non-commercial, one is commercial.  So you can't be there for

14 both non-commercial and commercial.

15          THE COURT:  The initial clause of that CFR limits

16 sub-section C.  You agree with that.

17          MR. SCHWAB:  Which one is that?  Persons entering

18 --

19          THE COURT:  No, except where security regulations,

20 rules --

21          MR. SCHWAB:  Sure.

22          THE COURT:  -- orders or directives is a

23 limitation on C.

24          MR. SCHWAB:  I agree.

25          THE COURT:  So in the absence of any of those

 1   things, C applies.  If there are those things C may not

 2   apply.  You agree that that's the way the statute reads.

 3              MR. SCHWAB:  And when you're saying all those

 4   things, you mean a security regulation, rule, or order,

 5   right?

 6              THE COURT:  Correct.

 7              MR. SCHWAB:  Okay, yes.  So the first question for

 8   the Court is the determination of the status of this room.

 9   If it is a lobby then the only regulation can be a security

10   regulation, rule, order, or directive.

11              THE COURT:  Well, do you agree --

12              MR. SCHWAB:  If it's not, then it's a different

13   story.

14              THE COURT:  Do you believe that C was intended to

15   collect like locations?  Similar locations using different

16   words to describe a similar location?

17              MR. SCHWAB:  No, because an auditorium is not a

18   foyer.

19              THE COURT:  Yeah.  And you know what?  You just

20   pointed out the only difference between those five.

21              MR. SCHWAB:  And I would argue a corridor and a

22   foyer are not the same either.  I would say that they are all

23   separate.  An entrance is the outside, when you enter into.

24   Foyer is like, I suppose, outside of the -- downstairs,

25   outside of the security gate.  Once you enter in you're in

1   the lobby where people do go up to the Clerk of the Court and

2   potentially conduct business.

3          THE COURT:  No.  Downstairs, at least in this

4   building, you have to go through a set of doors and then

5   you're into the Clerk of the Court.  But you enter from the

6   lobby.

7          MR. SCHWAB:  So I would define the area between

8   the outside front doors and the security as the foyer.  Then

9   the area between the security and you know --

10         THE COURT:  So what you're saying is that what the

11  Government believes is the distinct space has sections in it

12  under your interpretation.  So ten feet in maybe you're still

13  in something that would equate to an entrance, lobby, foyer,

14  corridor.  As you get closer to people actually doing

15  transactions, then you are not.  Is that what you're saying?

16  Are you saying the entire interior beyond those glass doors

17  where your client was arrested is one of those things, a

18  building entrance, lobby, foyer, or corridor?  I've got to

19  know exactly what you're saying.

20         MR. SCHWAB:  I would say the entrance in the

21  waiting room, and the areas where there are public materials,

22  that is a public lobby space.  That the Social Security

23  office chooses to confront -- to conduct their business in --

24  partially out in the open -- and again, if we're concerned

25  about privacy then they shouldn't be doing this in a public

1  space where someone can stand and listen.

2         THE COURT:  But it's still -- but you didn't

3  answer my question.  Are you sectioning up beyond those glass

4  doors calling a certain distance part of what's in subsection

5  C, and then beyond that, what's not in subsection C, are you

6  claiming beyond those glass doors, the whole thing is

7  subsection C?

8         MR. SCHWAB:  You know, I would leave that for the

9  Court.  I would submit that the area, the first entrance into

10 the area where there are public materials, the area where

11 there's a waiting room -- there's clearly conduct that would

12 be tolerated in this area that wouldn't be tolerated along

13 the walls where someone is conducting business.  Looking over

14 someone's shoulder while they're looking through pamphlets,

15 standing next to someone in the waiting room -- or sitting

16 next to someone.  That might be tolerated, but at the same

17 time, walking up while they're at that window wouldn't be.

18 And there is a distinction between those two conditions of

19 that property.

20        THE COURT:  But I've got to know what you're

21 arguing.

22        MR. SCHWAB:  Sure.

23        THE COURT:  Do you believe that there were spaces

24 in that large room your client could not photograph under the

25 law?

1        MR. SCHWAB:  I believe there were spaces in that

2   room that he could not stand and photograph, because that is

3   what -- you know, I -- would assert the whole thing is a

4   lobby, to tell you the truth.

5        You know, the Social Security office, they can

6   choose to conduct business in the lobby, as they did.  They

7   can choose to have more private office space, which they

8   didn't.  But that was their choice.  If they wanted to they

9   could have certain regulations that would apply to

10  potentially -- though I think under this it's about security

11  only and not about that.

12       If the Social Security office is flip, is

13  negligent with people's privacy, that's their choice, but

14  that apace was a lobby.

15       THE COURT:  But you don't disagree there's time,

16  place, and manner restrictions on free speech.

17       MR. SCHWAB:  I don't disagree, and that's what

18  this is.  I'm saying -- talking about this particular

19  regulation, if that space was a lobby -- and at the very

20  least there is a question as to whether that space was a

21  lobby, and there is evidence that one of the arresting

22  officers interpreted that space as a lobby, and there is --

23  so it's not beyond a reasonable doubt that that space was not

24  a lobby.

25       If that's the case, if that is the status of that

1   space, then the only regulations are security based, and not

2   privacy based.  Maybe the law should be better, but that's

3   not what the law is.

4            And we are -- when we're going to subject citizens

5   to criminal sanction, we have to be specific.  While I

6   personally would believe that there should be a privacy

7   exception here, that's not stated.  And we should know what

8   we're subject to.  Here, it says a security regulation.  So

9   if it's a lobby, then the only applicable regulations would

10  be a security regulation, which again -- and that's where

11  that first one falls into the --

12           THE COURT:  So are you moving only on the video

13  and not on the signage count?

14           MR. SCHWAB:  I think if -- I move on both because

15  if you agree with me on the latter --

16           THE COURT:  On which?

17           MR. SCHWAB:  On charge two.  Then charge one falls

18  within charge two, because that is a more general prohibition

19  from -- to the specific of charge two, which is security

20  regulation.  It narrows the scope on which regulations can

21  be.  That's for security purposes.

22           So if the only way he could violate this was by

23  violating security regulations, then he can't violate -- then

24  the other one folds.

25           THE COURT:  Well, I think you can violate 74.420

1  without violating 74-385, and I think the opposite is true

2  also.  You can violate 74.385 without violating 74.420.

3  That's why I don't think they're lesser included.

4          MR. SCHWAB:  I think it depends on the

5  circumstance here --

6          THE COURT:  Sure.  Of course, but --

7          MR. SCHWAB:  -- and here I think it would.  And if

8  you were to agree that it was a lobby, then the way that he

9  would necessarily have violated this was because there was a

10  security regulation.  Charge one is the only way he violates

11  it is if there is a regulation essentially.  A poster

12  regulating his conduct.

13          So if it's a lobby, the only way he can violate

14  charge two is if it's a specific regulation and a security

15  regulation.  And the only way he can violate charge one is if

16  it was a generalized -- I believe that the general yields to

17  the specific here.  So if it were the case that this was a

18  lobby, and this was not a proper security regulation, then

19  both charges would need to be dismissed.

20          THE COURT:  Anything further?

21          MR. SCHWAB:  No, Your Honor.

22          THE COURT:  Anything -- you want to offer any

23  argument?

24          MR. FANSLER:  I'm happy to if the Court would like

25  me to --

1      THE COURT:  You can if you want.  I mean, I'm not

2 going to make you.  I'm going to reserve ruling under 29B

3 anyway, but you're free to make argument.

4      MR. FANSLER:  I'll just say a couple of quick

5 things.  First, just to respond to this lesser included

6 argument, which I think Your Honor already did to some

7 degree.  The argument assumes that the GSA regulations

8 somehow preempts agencies from having their own signs and

9 policies or anything else.  I mean whether or not there's a

10 GSA regulation on photography wouldn't affect whether the

11 Social Security Administration, for SSA policy or any other

12 reasons, can have official signs.

13      Like Your Honor indicated -- or suggested --

14 there's not -- one doesn't necessarily preclude the other.

15 So this lesser included thing, I think, fails from that.  And

16 the fact that it was never raised in pre-trial motions.  That

17 would be an argument basically that there's a legal defect in

18 the indictment, which should have been raised in pre-trial

19 motions.

20      I don't know if I have much to add on what's in

21 the papers previously filed in pre-trial motions too on the

22 other point, other than to say that this is clearly, from the

23 photos, and I think the facts clearly show that it is space

24 occupied by an agency.

25      There's kiosks -- even in the one report he was

1   citing to, on page five of that report it talks about the

2   officers actually moving the kiosk so it's out of view of the

3   cameras.

4            It's clear the agency occupies the space, controls

5   the space, moves things, and so to say that it's not space

6   occupied by an agency, or that paragraph C somehow subsumes

7   the first two paragraphs for any lobby.  And so there's

8   always a reconsideration as you get further into agency

9   space, this seems a reading of that statute that doesn't

10  really work out.

11           So that's the only thing I would really add.

12           THE COURT:  Okay.  Did you want to put on any

13  evidence at all?

14           MR. SCHWAB:  Yes, Your Honor.

15           THE COURT:  Please proceed.

16           MR. SCHWAB:  I'm going to call Mr. Cordova.

17           THE COURT:  Very good.

18           THE COURT CLERK:  Please raise your right hand.

19           Do you solemnly swear or affirm, under the pains

20  and penalties of perjury, that you, in this matter before the

21  Court, shall tell the truth, the whole truth, and nothing but

22  the truth?

23           MR. CORDOVA:  Yes.

24           THE COURT CLERK:  Thank you.

25       Whereupon,

 1                    CHRISTOPHER CORDOVA

 2        was duly sworn.

 3                    DIRECT EXAMINATION

 4        BY MR. MR. SCHWAB:

 5        Q.    Good morning, Mr. Cordova.

 6        A.    Good morning.

 7        Q.    Can you state your name for the record?

 8        A.    Christopher Cordova.

 9        Q.    And can you tell me your occupation?

10        A.    I am an independent citizen journalist.

11        Q.    And how do you operate your journalism?  Or in

12   what methods in which -- do you conduct your journalism?

13        A.    I record anywhere that is publicly accessible.

14        Q.    And how do you publish your journalism?

15        A.    I have several platforms.  YouTube is my main one.

16        Q.    Tell me about what brought you to the Social

17   Security office this day.

18        A.    We were doing a story on the Social Security

19   office.

20        Q.    Okay.

21             THE COURT:  First of all, let me remind the

22   witness -- I should have done that already.  You realize you

23   have the right to remain silent under the Fifth Amendment of

24   the Constitution.  Anything you say in this court can

25   certainly be used against you in the prosecution of this

1   case.  You understand that.

2          MR. CORDOVA:  Yes.

3          THE COURT:  Do you wish to waive your Fifth

4   Amendment right to remain silent?

5          MR. CORDOVA:  Yes, I do.

6          THE COURT:  Please proceed.

7       BY MR. SCHWAB:

8       Q.   Tell me what brought you to the Social Security

9   office that day.

10      A.   We were doing a story on the Social Security

11  office.

12      Q.   And in preparation for going out there did you

13  review any regulations?

14      A.   Yes, I did review the CFR in question.

15      Q.   And what was your understanding of what was

16  permitted?

17          MR. FANSLER:  Objection.  Relevance.

18          THE COURT:  Well, he's -- okay, go ahead and

19  explain your --

20          MR. SCHWAB:  State of mind.

21          THE COURT:  Yeah, he's not asking him to interpret

22  it as a matter of law.  Intent is an element in most crimes,

23  so I'll find that it's relevant enough for him to testify to.

24  Overruled.

25          BY MR. SCHWAB:

1      Q.    What did you understand that regulation to permit?

2      A.    It permits for news purposes audio and video

3  recording in public accessible areas, including the foyer,

4  the lobby, hallways, corridors, stuff like that.  And I

5  believe that that area that I walked into was a lobby.

6      Q.    Okay.  And you were -- several -- I believe we've

7  heard testimony earlier today that certain posters were

8  pointed out to you, correct?

9      A.    Correct.

10      Q.    Did anyone tell you the nature of how those signs

11  were official?

12      A.    No.

13      Q.    Did they explain why you weren't allowed to record

14  under those signs?

15      A.    No.

16      Q.    Did anyone tell you that there was -- did you see

17  any security lines in this office?

18      A.    No.

19      Q.    Did you see any security being done in this

20  office, aside from several security guards?

21      A.    No.

22      Q.    Do you recall if those signs prohibited conduct

23  related to security?

24      A.    No, I do not.

25      Q.    Do you recall being told that the reason you

1   weren't allowed to record was for privacy reasons?

2       A.   Yes.

3       Q.   Did you ever record anyone's private information?

4       A.   No.

5       Q.   Was your intent to go and record people's private

6   information?

7       A.   Absolutely not.

8       Q.   What did you intend to record?

9       A.   I intended to record just the public area.  I

10  wanted to get some pamphlets.  I wanted to just kind of get

11  some B roll footage of what -- of the Social Security office,

12  what it looks like.  Just the public area, but absolutely

13  wasn't trying to record someone's personal information.

14      Q.   Were you ever going to walk up to one of those

15  vestibules, or the windows where people were conducting

16  business?

17      A.   No.

18      Q.   And were you expecting to be there for three

19  hours?

20      A.   No.

21      Q.   How long did you think you'd be there for?

22      A.   Maybe 10 minutes.  20 minutes max.  Probably 10 to

23  20 minutes.

24      Q.   And that area -- so the area you were standing in,

25  what did you understand that area to be?

1        A.    A foyer.

2        Q.    And what did you understand the area through those

3    next doors to be?

4        A.    A lobby.

5        Q.    Okay.

6              MR. SCHWAB:  No further questions, Your Honor.

7              THE COURT:  Thank you.  Cross examination?

8                         CROSS EXAMINATION

9    BY MR. FANSLER:

10        Q.    You said on direct that you were there to make --

11    you said on direct that no one explained why you could not

12    record in there?  Did I hear you say that?

13        A.    They -- correct.

14        Q.    So the whole time you were there, the three and a

15    half hours, no one explained to you why you could not record

16    in the Social Security Administration space.

17        A.    I can't recall them explaining why.

18        Q.    You recorded a video of all your interactions with

19    the officers that day, didn't you?

20        A.    I did.

21        Q.    I'm going to play just a couple of clips from that

22    video.  Starting with Government Exhibit 1 at 2:48:58 to

23    2:51:00.

24          (Video played in open Court)

25             BY MR. FANSLER:

1      Q.   Actually, I'm going to play you a different one.

2  That one is a longer clip.  From Government Exhibit 1, 42:00

3  to 44:06.

4      (Video played in open Court)

5      BY MR. FANSLER:

6      Q.   Did you hear the officer on that video state that

7  you can't record in there because of people's personal

8  information?

9      A.   I did.

10     Q.   Mr. Cordova, you also told your viewers that day

11 that you were there to create a court case.  That was your

12 purpose, right?

13     A.   That's incorrect.

14     Q.   You did not tell your viewers that you were there

15 to create a court case?

16     A.   I don't know if I said that I was there to create

17 a court case.  That was not my intent.  My intention was to

18 do my story.  If subsequently I get arrested, that would

19 create a court case, but I am there to exercise my First

20 Amendment right.  That is true.

21     Q.   I want to play you a clip from Government Exhibit

22 4 at 3:48:46 to 3:49:14.

23     (Video played in open Court)

24         THE COURT:  So what is the statement that you're

25 using to impeach, please?

1    BY MR. FANSLER:

2    Q.   The very -- so at the very end of that video you

3    said we're here trying to create case law.  Did I hear that

4    right?

5    A.   After I was arrested, then yes, I would like to

6    create case law.  But my intent was not to specifically go in

7    there to be arrested.

8    Q.   Your intent before you were arrested though was to

9    create a paradigm shift, right?  A paradigm shift in First

10   Amendment law.

11   A.   No, my intention was to do a story on the Social

12   Security office.

13   Q.   Did you tell your viewers before you ever went in

14   that day that you were there to create a paradigm shift?

15   A.   I never used the word paradigm shift.

16   Q.   Government Exhibit 1 at 1:11:14 to 1:11:39.

17   (Video played in open Court)

18   BY MR. FANSLER:

19   Q.   So in the video you said we're here to have a

20   paradigm shift.  Did I hear that right?

21   A.   You did hear that.

22        MR. FANSLER:  Nothing further, Your Honor.

23        THE COURT:  Okay, do you want redirect?  By the

24   way, did you ever do your story?

25        MR. CORDOVA:  I was not able to do my story.

1          THE COURT:  Why?

2          MR. CORDOVA:  Well, I wasn't able to -- I did

3    publish the video, but I wasn't able to go inside and do what

4    I wanted to do inside the lobby.

5          THE COURT:  I thought you said you wanted to write

6    a story.

7          MR. CORDOVA:  Well, it's not a written story.

8    It's a video story.

9          THE COURT:  Go ahead.

10                    REDIRECT EXAMINATION

11    BY MR. SCHWAB:

12    Q.   Briefly, we just heard you say the term paradigm

13    shift.

14    A.   Uh-huh.

15    Q.   You heard that was an hour into your video, right?

16    A.   Yeah.

17    Q.   Did your intentions change from before you went

18    there to an hour in?

19    A.   Yes.

20          MR. SCHWAB:  No further questions, Your Honor.

21          THE COURT:  Okay.  Any re-cross?  You may step

22    down.  Thank you so much.  Any other evidence?

23          MR. SCHWAB:  No, Your Honor.

24          THE COURT:  And would you -- you didn't make an

25    opening statement.

1           MR. SCHWAB:  I'll just close.

2           THE COURT:  You waive?

3           MR. SCHWAB:  Yeah.  I mean obviously -- I don't

4    think it makes sense to make a statement and then close.

5           THE COURT:  Do you want to do an oral summation or

6    a written summation from the United States?

7           MR. FANSLER:  The United States is prepared to do

8    an oral summation.

9           THE COURT:  How about you?

10          MR. SCHWAB:  I'd prefer to do an oral.

11          THE COURT:  Very good.  Please proceed.

12          MR. FANSLER:  This is not a complicated case.

13   It's not complicated regulations.  It's about official signs.

14   It's about lawful directions, about security rules, orders,

15   and directives.  And it's about space occupied by an agency.

16          So two counts.  Count 1 is non-compliance with

17   official signs or lawful directions.  The Government must

18   prove first, either that there were official signs posted, or

19   second, that Federal authorized individuals gave lawful

20   directions.  Second, that the Defendant didn't comply.

21          The official signs, Commander Whiles said that

22   they were official signs.  They weren't developed by this

23   field office.  They were from Social Security Administration.

24   You saw the text of them that clearly prohibited this

25   conduct.

1            You saw multiple Federal officers, either FPS

2    employees or those contractors for the Federal Protective

3    Service, which Commander Whiles testified were also Federal

4    authorized individuals, give those lawful directions.

5            Mr. Cordova didn't comply.

6        (Video played in open Court)

7        BY MR. FANSLER:

8        Q.   That brings us to Count 2, unlawful photography.

9    The elements are that first, the Government must show the

10   Defendant took photographs that either security regulations,

11   rules, orders, or directives prohibited photography, that the

12   photographs were of space occupied by an agency.  You don't

13   have to be standing in the space, it just has to be of space

14   occupied by an agency.  That there were non-commercial

15   purposes, and that the Defendant didn't have permission.

16           He took photographs.  He posted photographs in the

17   form of a three and a half hour YouTube clip.  We saw many

18   videos -- many clips from that video.

19           THE COURT:  Well, go back to the previous -- that

20   slide.  The previous one.  So where do you get the third

21   element?

22           MR. FANSLER:  Well so, I mean it's a -- so in the

23   paragraph A and B, if you're taking photos of space occupied

24   by an agency, it can either be for non-commercial or

25   commercial purposes.

1        THE COURT:  Well, this would clearly be commercial

2   purposes.  Engaging in commerce.  So it seems to me that the

3   Social Security Administration, when dealing with customers,

4   their finances, their access to benefits from the United

5   States, that would be commerce.

6        So wouldn't it be -- this is a space occupied by a

7   tenant agency for commercial purposes?  Then if so,

8   photography may be had only by written permission of an

9   authorized official of the occupying agency concern.

10        But nowhere in the regulation does it address the

11   purpose of the photographs.  That third elements seems that

12   you're actually contending that there's -- if he didn't have

13   a non-commercial purpose that it would be lawful.

14        So I'm not sure the regulation deals with the

15   purpose of the taking of the photographs.  It deal with the

16   space occupied where the photographs are being taken.  Do you

17   agree with me?

18        MR. FANSLER:  I don't think it matters ultimately

19   for this case because he didn't have permission.  So whether

20   it was commercial or non-commercial purposes.

21        I think you're right that the way it's written

22   sounds like it's the agency's purpose and whether it's a

23   commercial or non-commercial space --

24        THE COURT:  Right, but that's -- the title of the

25   regulation is inconsistent with the text of the regulation.

1    MR. FANSLER:  That's -- and that's where I think

2    there is also a good argument that -- yeah, I don't think it

3    matters for this one because the important thing is that is

4    it space occupied by an agency, and if it is, did he have

5    permission.  So I guess whether it's commercial or non-

6    commercial and whether the agency's purpose is commercial or

7    non-commercial doesn't matter, because in any event the

8    Government just needs to prove that it was space occupied by

9    an agency and he had no permission, whether written or --

10    THE COURT:  Either way he had no oral or written

11    permission.

12    MR. FANSLER:  That's right.

13    THE COURT:  Okay.

14    MR. FANSLER:  So he took photographs.  Security

15    regulations, rules, orders, or directives prohibited

16    photography.  There was a rule.  The rule very clearly has a

17    warning sign with exclamation points, photography and

18    videography prohibited.

19    The Defense Counsel made a lot of the argument

20    that -- whether the reports knew it was a security sign or

21    not.  Ultimately the people testified were Federal Protective

22    Service employees, and they didn't know at the time.  Whether

23    that's in the report doesn't really matter.  What Commander

24    Whiles testified today is it was a security sign.  He

25    followed up and found that out.

1          There were orders --

2      (Video played in open Court)

3          MR. FANSLER:  -- and there were directives.  Mr.

4  Cordova calls it a directive.

5      (Video played in open Court)

6          MR. FANSLER:  An unlawful directive.  And the

7  space was occupied by the agency.  You see the kiosk, you see

8  the customers meeting with agency officials.  You see agency

9  chairs, agency signs, agency pamphlets.  It was clearly space

10 occupied by an agency.

11          And he didn't have permission, so whether it was a

12 commercial or non-commercial purpose doesn't matter because

13 he didn't have written or oral permission, and there's no

14 evidence otherwise.

15          So the Government submits it's proven its case

16 beyond a reasonable doubt on both counts, and the Court

17 should find the Defendant, Mr. Cordova, guilty of both

18 counts.

19          THE COURT:  Thank you.

20          MR. SCHWAB:  So I'm going to do something rare

21 here and agree with the Prosecution regarding the

22 interpretation of this rule.  There are three purposes under

23 which this rule -- the second claim or second charge, 41 CFR

24 102-74.420 applies.  There are the commercial purposes of an

25 individual, there are the non-commercial purposes of the

1   individual, and there are the news purposes of an individual.

2   And there is not the sense of these spaces are occupied and

3   these spaces aren't occupied --

4           THE COURT:  You know what?  Hold on.  I think I

5   may be misreading that.  So it is photographing for a

6   commercial purpose or photographing for a non-commercial

7   purpose.  It's not whether the tenant is using it for a

8   commercial purpose --

9           MR. SCHWAB:  Correct.  That's my reading.

10          MR. FANSLER:  I would agree with that reading,

11  Your Honor.

12          THE COURT:  So I -- it's drafted poorly.  I mean

13  the space -- obviously may take photographs for commercial

14  purposes if -- for non-commercial purposes if -- and of

15  building entrances.  But now I see what you're saying, and I

16  agree with you.  Go ahead.

17          MR. SCHWAB:  Okay.  And that means that that third

18  section, for news purposes, is distinct and different.  The

19  idea that the distinction between A and B and C is whether

20  the tenant agency is occupying the area or not, that's not --

21  that's not a correct reading of the statute.

22          Auditoriums, are those just free floating spaces

23  that nobody owns?  Of course, they're occupied by that

24  tenant.  All of these spaces are occupied by the tenant,

25  including a lobby.  A lobby is not a free floating space that

1   nobody owns, and nobody manages, and nobody has rights over,

2   and nobody locks the doors.

3        THE COURT:  And you can't spend the night there

4   either, probably.

5        MR. SCHWAB:  I would presume that you can't spend

6   the night.  And in fact, they even talk about that being a

7   foyer, and that they lock the front doors outside.  I assume

8   that no one can sleep in that vestibule.

9        So the distinction is not this was a tenant

10  occupied space, so therefore three doesn't apply.  The

11  question instead is was this an entrance, lobby, foyer,

12  corridor, or auditorium?  Those are all distinct and

13  different spaces.

14       Certainly a corridor is something like a hallway,

15  which is not a building entrance.  And I would -- as I've

16  made this argument multiple times, a lobby is different than

17  a foyer.  A foyer is where you walk into when you first walk

18  in, and maybe that's where you take your coat off.  A lobby

19  is where you wait.  A lobby is a public space where you wait

20  to be served.

21       And at the very least, both for the purposes of

22  whether the People have proved beyond a reasonable doubt, but

23  also for the purposes of ambiguity under the First Amendment.

24  The First Amendment is absolutely called into question here

25  because this was photography.

1          The Tenth Circuit recently, in Yehia, observed and

2    recognized a First Amendment right to film public operations.

3    Now obviously there are -- that makes it subject to further,

4    you know, forum, non-forum, and if you'd like I can give you

5    a cite for Yehia v. Irrizary.  I was on that case.

6          THE COURT:  I know Mr. Irrizary very well.  So let

7    me ask you this.

8          MR. SCHWAB:  Sure.

9          THE COURT:  So from a textual standpoint, A, B,

10   and C are distinct.

11         MR. SCHWAB:  Yeah.

12         THE COURT:  And C attempts to distinguish a space

13   from that identified in A and B.  You agree with that.

14         MR. SCHWAB:  Yes.

15         THE COURT:  So what is the difference, we have to

16   ask, right?  And you're saying it's so vague it doesn't give

17   somebody notice?  Is that what you're arguing?

18         MR. SCHWAB:  I believe that there is an element to

19   that, yes.  The fact that one of the police officers himself

20   described the space as a lobby and another doesn't, that goes

21   to showing this ambiguity --

22         THE COURT: You mean one says lobby, one says

23   foyer?

24         MR. SCHWAB:  One refers to it as a waiting room.

25         THE COURT:  Okay.

1    MR. SCHWAB:  If you look -- review the two -- in

2  fact, if you were to review all of those -- I know they

3  weren't admitted, but in Exhibit 12, every single person --

4  the other people refer to it as a waiting room.

5    THE COURT:  The space he was in first for most of

6  the time?

7    MR. SCHWAB:  No, the later space.  It's never

8  referred to as the offices.  It's referred to as a waiting

9  space, as a lobby.  But that -- whether it was --

10    THE COURT:  Who refers to it as the lobby?  And

11  where do they do that?

12    MR. SCHWAB:  Officer Ramos, I believe.

13    THE COURT:  The space beyond the second set of

14  glass doors.

15    MR. SCHWAB:  Yes.  Yes.  I'll turn your attention

16  to Exhibit 12.  And upon arrival we entered through the foyer

17  and into the lobby.  The male then proceeded to join the two

18  others in the foyer and began yelling about their

19  Constitutional rights.

20    And I apologize, Your Honor, I have this -- so at

21  the very -- the first -- in the second paragraph he says yes,

22  upon arrival we entered into the foyer -- through the foyer

23  and into the lobby.  Later he advised the individuals -- the

24  individuals were advised by the on duty PSO that they were

25  not allowed to film in the lobby of the SSA.

1        THE COURT:  But are you aware of the word lobby

2   being used in any of those videos?

3        MR. SCHWAB:  I'm not aware of that --

4        THE COURT:  Are you aware of the word lobby being

5   used in any of those videos?

6        MR. FANSLER:  I am aware of a clip I did not play

7   where Commander Whiles actually explains why he does not

8   consider it a lobby.

9        THE COURT:  Consider what a lobby?

10        MR. FANSLER:  That area where they end up going.

11   Where Mr. Cordova --

12        MR. SCHWAB:  And I'm not familiar with that clip,

13   but regardless --

14        THE COURT:  No, not regardless.

15        MR. SCHWAB:  Sure.

16        THE COURT:  If he had called it a lobby to Mr.

17   Cordova's face, that next space --

18        MR. SCHWAB:  Sure.

19        THE COURT:  -- that could be a problem for the

20   Government.

21        MR. SCHWAB:  Of course, that would --

22        THE COURT:  Because the word lobby is explicitly

23   used in the regulation as a place you can photograph.

24        MR. SCHWAB:  And I understand.  Of course, that

25   would be better for me.  Of course.  I would say that would

1    categorically make it so that this was a lobby.

2              THE COURT:  It would have been a problem.

3              MR. SCHWAB:  What I'm saying is instead, it is not

4    categorically not a lobby.  They have a burden of proof here,

5    that it is beyond a reasonable doubt that that was not a

6    lobby.  Here is one of these two arresting officers calling

7    it a lobby.

8              But also, for the purposes of the First Amendment

9    there's the question of vagueness, that we are not subject to

10   -- we are not able to -- should not be subject to criminal

11   sanction for otherwise protected activity unless it is

12   definite.  And if one of the arresting officers calls this a

13   lobby, I don't know how that's not vague.

14             THE COURT:  So the vagueness doesn't depend on the

15   person who happens to be at that moment subjected to the law.

16   It depends on the Court's interpretation as applicable

17   broadly to everybody, whether it's unconstitutionally vague,

18   correct?

19             MR. SCHWAB:  Sure, but I would submit that one of

20   the individual's involved impression of that space is helpful

21   for understanding how the average person would understand the

22   space.

23             THE COURT:  Well, I only would agree with you if

24   the case law has defined that as relevant to the analysis.

25   But if the case law doesn't define the individual's own

1  perception as relevant to the analysis, then of course, it's

2  not.

3          MR. SCHWAB:  No, but the thrust of that line of

4  reasoning is that we should be -- that citizens shouldn't be

5  subject to vague regulations.  Of course, the Court makes the

6  legal determination as to whether it's vague, but I would say

7  it certainly assists the Court in seeing how others

8  interpreted it to see what the average person --

9          THE COURT:  So that's where we are.  That is the

10  essence of what your dispute is right now.

11          MR. SCHWAB:  For the First Amendment argument.

12          THE COURT:  Because there's no fact dispute as to

13  what happened.

14          MR. SCHWAB:  No, I don't believe there is, Your

15  Honor.

16          THE COURT:  Right, there's only a legal dispute as

17  to whether, number one, that was one of those items in C,

18  which is what you're relying on.

19          MR. SCHWAB:  For this, yes, Your Honor.

20          THE COURT:  You're arguing that where your client

21  ultimately was at 74.420.c space.

22          MR. SCHWAB:  Correct.

23          THE COURT:  And if it's not, then the statute is

24  vague.  That's what you're saying.

25          MR. SCHWAB:  Correct.

1          THE COURT:  All right.

2          MR. SCHWAB:  That's my -- my primary is that he

3    was protected by this.  The secondary would be they haven't

4    proven actually beyond a reasonable doubt that this was a

5    lobby.  And I suppose that's kind of a subsection of that

6    first argument.

7          Then the third would be that if it is determined

8    that this was not a lobby, that this was not within that

9    space in C, then it's at least vague to the degree that it

10   does not provide --

11         THE COURT:  But does proving beyond a reasonable

12   doubt analysis even apply to a Court's legal decision about

13   what a space is and whether a statute is Constitutional or

14   not?  Because proof of a reasonable doubt is what factually

15   occurred.

16         MR. SCHWAB:  Sure, and I believe that one of the

17   elements here must be that he was not in a foyer -- or was

18   not doing -- performing news services or news -- was not

19   engaged in activity for news purposes in a building entrance,

20   lobby, foyer, corridor, or auditorium.

21         That is an element.  I believe that that element

22   needs to be proven beyond a reasonable doubt too.  They must

23   prove beyond a reasonable doubt that all three, A, B, and C -

24   - now we're not contesting A and B.  He did not have

25   permission.  So it really relies on C.

1        But they have to prove C beyond a reasonable

2   doubt, and to prove that they must prove that he was not

3   performing news services, or that he was performing news

4   services, but was not doing so in a building entrance, lobby,

5   foyer, corridor, or auditorium.  And that proof, that

6   element, must be met beyond a reasonable doubt.

7        THE COURT:  So is there any argument at all that

8   this isn't except where security regulation, rule, order, or

9   directive applies?

10       MR. SCHWAB:  So that would be the next step.  If

11  you were to determine that it absolutely was not a lobby or

12  foyer beyond a reasonable doubt, then the security regulation

13  --

14       THE COURT:  No, if I was to determine that it was

15  a lobby he was in ultimately, but also determine that a

16  security regulation prohibits otherwise --

17       MR. SCHWAB:  Yes.

18       THE COURT:  -- then he still might be in violation

19  of the law.

20       MR. SCHWAB:  Correct.

21       THE COURT:  Okay.

22       MR. SCHWAB:  What I'm saying is you first have to

23  make the determination on the lobby.  If you determine it was

24  a lobby then you turn to the security regulation question.

25  And that's where I'm headed next.

1          So I believe at this point that the United States

2   has not proven beyond a reasonable doubt that this was not a

3   lobby space.  They've introduced one -- testimony of one

4   individual who does not work there, who does not frequent

5   that space, but we do have evidence where there is some

6   understanding of this space by these Federal officials that

7   it was a lobby.

8          THE COURT:  Right.  Well, because -- I mean you've

9   probably seen the Supreme Court law on when there's actual

10  video of something, really it's up to a Court to decide from

11  that video whether there's some legal consequence.  And

12  honestly, anybody's testimony about it is just not going to

13  be relevant because I could see it live as it's happening,

14  and then can make the determination under the law whether

15  that is one of those spaces and see whether it's more

16  interior space described under A and B.

17          MR. SCHWAB:  Fair enough.  But again -- and I

18  refer to my motion to dismiss where I provide those

19  definitions of what a lobby is in support of, in fact, Mr.

20  Ramos' understanding as well that it's a waiting space where

21  you wait for services.  And that space very clearly is a

22  waiting space.

23          But again, the question is not do you believe

24  absolutely that it wasn't a lobby -- or rather that you're

25  not sure, you would lean away from lobby.  You have to be 100

```
 1   percent convinced beyond a reasonable doubt that that wasn't

 2   --

 3            THE COURT:  Not 100 percent.

 4            MR. SCHWAB:  Sorry, beyond a reasonable doubt.

 5            THE COURT:  Don't misstate the burden.

 6            MR. SCHWAB:  I apologize, Your Honor.  I tried to

 7   trick you.  Turning then, these regulations, these signs that

 8   they've posted, they're not security regulations.  You have

 9   the burden -- or the job of making that determination, but

10   we've heard over and over this was for privacy purposes.

11   Those are maybe important policy considerations --

12            THE COURT:  Right, but what the --

13            MR. SCHWAB:  -- but they're not security.

14            THE COURT:  How are you viewing the word security

15   in this context?

16            MR. SCHWAB:  I believe that that is akin to you

17   can't record security officers, the ways in which we secure

18   the building.  If we were to say security means securing

19   people's personal information, I don't know, I worry that we

20   could say we're securing people's ability to eat lunch, and

21   so no filming in public courtyards.  We are securing -- it

22   would stress the word security beyond anything if it goes

23   beyond what is actually securing the building.  If that were

24   to be --

25            THE COURT:  Have you been to the National
```

1    Archives?

2            MR. SCHWAB:  Not in many years.

3            THE COURT:  Have you seen the U.S. Constitution or

4    the Declaration of Independence?

5            MR. SCHWAB:  No, I've never seen that --

6            THE COURT:  You can walk in and see the original,

7    and it's behind a very thick piece of glass.

8            MR. SCHWAB:  Sure.

9            THE COURT:  You can stand there and look at it.

10           MR. SCHWAB:  Yeah.

11           THE COURT:  Would you call that piece of glass a

12   security device for that document?

13           MR. SCHWAB:  Certainly the document I wouldn't.  I

14   don't think the Constitution would count as a security device

15   --

16           THE COURT:  No, no, no.  The piece of glass that

17   both filters out light, air, so it doesn't deteriorate --

18           MR. SCHWAB:  I think that's arguably yes, a

19   security device.

20           THE COURT:  For the purpose of securing a piece of

21   paper.

22           MR. SCHWAB:  Correct.

23           THE COURT:  So security can refer to both the

24   security of a person, and the security of property.

25           MR. SCHWAB:  Sure.

1            THE COURT:  You agree?

2            MR. SCHWAB:  Yes.

3            THE COURT:  So anything in there that's intended

4   to secure both information, paper, property, and persons

5   could be reasonably viewed as security.

6            MR. SCHWAB:  I would agree, but again, we're

7   talking about now protecting, not securing.  And those are

8   two different terms.  Protecting people's personal rights or

9   privacy rights is different than securing -- security of the

10  Constitution from theft.

11           THE COURT:  I'm not so sure.  So you see that

12  kiosk that had the two sides where somebody standing next to

13  it couldn't see what the person was doing?

14           MR. SCHWAB:  Yes.

15           THE COURT:  That's a security device for making

16  sure someone over here can't see what somebody is entering on

17  a computer.  Would you agree?

18           MR. SCHWAB:  No. I would submit that that's a

19  privacy device.  They weren't trying to secure people from

20  harm, and they weren't trying to secure documents from theft.

21           THE COURT:  Well, theft can be both physically

22  taking and actually -- mean when identity theft occurs no one

23  is physically taking anything.

24           MR. SCHWAB:  Sure.

25           THE COURT:  They are taking information and using

1   it in an improper way.  That's still theft, correct?

2           MR. SCHWAB:  Yes.  It's -- I just think we're

3   torturing this definition of security beyond -- you know, I

4   worry, if all of privacy is encompassed within security, then

5   there's a lot -- then this is a much broader statement.  I

6   think personally --

7           THE COURT:  We're having some fun here.

8           MR. SCHWAB:  Yeah.

9           THE COURT:  You have any problem -- would your

10  client have any problem with a U.S. Government drone flying

11  over his property that has one of those cameras so good you

12  can see from outer space and videoing everything that he's

13  doing, including through his windows into his house?  Do you

14  have any problem with that?

15          MR. SCHWAB:  Yes, but that's not a concern of

16  security.  That's a concern of privacy under the Fourth

17  Amendment.  I'm distinguishing.  I think that there's a

18  distinction between privacy and security.

19          THE COURT:  Take that same camera, and it's

20  looking sideways into somebody's personal information.  Any

21  different?

22          MR. SCHWAB:  I'm not saying that there shouldn't

23  be a regulation for privacy.  I'm saying that this one

24  doesn't.  That it is -- the plain language is clear here and

25  it says security.  They very well could have written security

1   or privacy --

2             THE COURT:  You mean 74.385.

3             MR. SCHWAB:  Yes.  I'm not speaking to what would

4   be good policy.  I'm speaking to what's written.  And what's

5   written does not contemplate or discuss privacy concerns.  It

6   discusses security.  I think largely what is intended here

7   would be the security line.  You know, security cameras,

8   making sure that people aren't breaking into facilities and

9   that we're securing these buildings.  This is not what should

10  be, but what is, Your Honor.  And what is does not say

11  personal information here.  Nobody ever said the word

12  security until they read over the regulations and got into

13  court.  There was no discussion -- these are for people's

14  personal information, their confidential information.  This

15  is not this is for security purposes.

16            THE COURT:  Well, your client testified he was

17  aware of the regulation before he entered the building.

18            MR. SCHWAB:  Yes, of this.  Of this, not of the

19  signs.

20            THE COURT:  No, of the regulation.

21            MR. SCHWAB:  Of 102-74.420.  Yes, Your Honor.

22            THE COURT:  Right, Exhibit 14.

23            MR. SCHWAB:  Yes, Your Honor.  So again, I've seen

24  no proof other than some -- I would argue -- self-serving

25  testimony that this was a security regulation.  We have not

1  seen where this comes from.  We have not seen the folders, we

2  have not seen testimony from someone that drafted it, an

3  administrator that said this was this was for.

4        We've heard some testimony that this is held

5  somewhere on some database in a security folder, but more to

6  the point, these signs don't specify the purpose, they don't

7  narrow in on security purposes.  They just have a general

8  broad prohibition.

9        THE COURT:  Well again, an agency -- actually in

10  administrative law agencies' interpretations of their own

11  regulations do carry weight.  You know that probably.  I

12  don't know if you do administrative law or not.

13        MR. SCHWAB:  I don't, but he's not a Social

14  Security administrative employee.

15        THE COURT:  No, I understand.  But an

16  administrative agency's interpretation of their own

17  regulations is, under the law of entitled deference, in that

18  context.  And I don't know if it applies to the criminal

19  context, but that's a general proposition in administrative

20  law.

21        MR. SCHWAB:  Yeah.  I don't know if it applies to

22  criminal --

23        THE COURT:  Agreed.

24        MR. SCHWAB:  -- I will tell you I did a case law

25  research for security regulation, and essentially every

1  single result that popped up was Homeland Security regulation

2  or Social Security regulation.

3         THE COURT:  So you don't think my research is

4  going to show anything that interprets this particular

5  regulation.

6         MR. SCHWAB:  I mean there are only about -- yeah,

7  I doubt it.  I doubt it, and if there -- I have not seen any

8  interpretation by the Social Security Administration as to

9  what this means.

10         So yes, they would be potentially -- I don't want

11  to concede that criminal is not different.  I would argue

12  that it is.  But even if it weren't different, I've seen no

13  interpretation, certainly no evidence has been produced as to

14  how the Social Security Administration interprets the term

15  security regulation.

16         It would seem problematic to me for them to

17  interpret it differently at each case whenever they're

18  pursuing a conviction.  I think it would need to be ahead of

19  time.

20         But I don't believe that there is such an

21  interpretation out there.

22         Turning to those signs, those signs are not clear

23  that they prohibit his conduct.  They say in the offices.  I

24  don't believe that this was an office space.  This was a

25  large space, but the office would be behind those glass

 1  doors.  They would be in those hallways.  They would be in

 2  private spaces.

 3          This is where we turn to that first claim.  Really

 4  it's kind of both.  The first one, it says while in the

 5  office.  The second one says Federal law and SSA policy

 6  prohibit taking pictures inside SSA offices.  Also does not

 7  differentiate between -- it suggests the lobby question.

 8          Then the last one, it looks like it is a copy of

 9  that same -- it looks like we have two different signs.  Both

10  of them refer to offices.  And offices, plural.  Not the

11  office.  Not the Social Security office, but offices.  Right?

12          THE COURT:  That's because the sign was intended

13  to be put on multiple kind of building and spaces.

14          MR. SCHWAB:  Sure.

15          THE COURT:  They may be -- this sounds like a free

16  standing Social Security building, but there may be -- as you

17  know, the Federal building at 1961 Stout has a dozen Federal

18  agencies in it.  You get off the elevator on any one floor

19  you're in a different agency.

20          MR. SCHWAB:  Yeah.

21          THE COURT:  So they -- in order to save money, I'm

22  sure, they make these broadly applicable to different kinds

23  of places.

24          MR. SCHWAB:  Sure.  But my -- I guess, and I

25  apologize, I kind of got away from that.  My point is that it

1  says offices here, and I would submit that this space was a

2  lobby and not an office.

3            THE COURT:  Right.  So look at Exhibit 3, the

4  fifth page.

5            MR. SCHWAB:  Okay.

6            THE COURT:  See what the top sign says?

7            MR. SCHWAB:  I do.  I would say that office hours

8  is a slightly different term of art than office.  We are

9  picking at threads here.

10           THE COURT:  That one's not a thread.

11           MR. SCHWAB:  No, no, no.  What I'm saying is

12  distinguishing different spaces is different -- you're never

13  going to have lobby -- well, I guess you could have lobby

14  hours.  Probably not going to have foyer hours.  These are

15  the hours you're allowed in the foyer.  But I think it's

16  pretty indisputable that this space that they were in for the

17  three hours was a foyer.

18           But I would say that that term refers to the whole

19  space, but offices is a distinct word.  Or at least is

20  reasonably understood to be a distinct phrase of you don't

21  get to video tape when you're in someone's office.  When

22  you're at that space.  That's different than when you're in a

23  lobby.

24           Again, ultimately I fall back on my previous

25  argument, that the specific overrules the general.   There is

1  a very specific statute here, or regulation, that both

2  creates an affirmative protection or right, or something to

3  that -- akin to that right.

4          THE COURT:  Well, it reflects a right created

5  elsewhere in a more important document.

6          MR. SCHWAB:  Sure.  And that's what's going to

7  control here.  I would say that these are not security

8  regulations broadly in that case.

9          Regardless, this would be subsumed into that.

10 They can issue lots of rules and posters that aren't spoken

11 to elsewhere, but as it relates to photography, 420 is clear.

12 It has to be a security regulation.  These, as we've heard,

13 refer to confidentiality and personal information, not

14 security mechanisms.

15         The last issue I would point out, Your Honor, is I

16 don't know how to tease this out.  Believe me, I've thought

17 about it.  I don't know what makes a sign official and not.

18 I haven't heard testimony as to who placed this, if this was

19 just a janitor who threw this up, if someone with a printer

20 that didn't want to be photographed threw this up, or if this

21 was an officially -- you know, enacted, adopted poster by the

22 person that controls this office.  Certainly that person was

23 not here to testify today as to how this poster came to be

24 posted.

25         THE COURT:  Yeah, you're not going to die on that

1    hill though, probably.

2           MR. SCHWAB:  I'm not going to die on that hill,

3    but -- and the truth is I really don't know how the People

4    would prove that, other than bringing someone in to testify

5    yes, I did adopt that.

6           But it doesn't say signs of a regulatory or

7    directory nature, but official signs.  And at least I would

8    say the evidence does not support a finding on a reasonable

9    doubt that these are official signs.  You know, the United

10   States could have brought someone in to speak to how these

11   signs came to be posted.  They didn't.  That was their

12   choice.

13          But they have an obligation to prove each element

14   beyond a reasonable doubt, and one of those elements is that

15   these signs were indeed official.  I have seen no evidence.

16   Certainly Mr. Whiles does not have that personal knowledge or

17   information and could not speak to whether these particular

18   signs were adopted by --

19          Unless you have any other further questions, or

20   would like to just rap here for a minute, Your Honor, I'll --

21          THE COURT:  I'm here for you.  So you have the

22   floor.

23          MR. SCHWAB:  I have nothing further, Your Honor.

24          THE COURT:  Thank you.

25          MR. SCHWAB:  Thank you.

1          THE COURT:  Any rebuttal?

2          MR. FANSLER:  The only thing -- I know that we

3   talked about the signs not being a hill to die on.  Commander

4   Whiles did talk about them coming from the central Social

5   Security Administration.

6          The other thing, I don't think Your Honor even

7   needs that testimony.  You have the photos that show the

8   official seal on the bottom, the GSA seal and the SSA seal.

9   It says Federal Law and SS policy does this.

10          THE COURT:  It says produced at the U.S. taxpayer

11   expense.  It actually gives a publication number.  It gives

12   an ICN number.  Again, he said he's not going to die on that

13   hill.

14          MR. FANSLER:  That's right.  Yeah.  I don't have

15   anything beyond that to add that we haven't already --

16          THE COURT:  Okay.

17          MR. SCHWAB:  Your Honor, briefly --

18          THE COURT:  You may.

19          MR. SCHWAB:  Those numbers, you should Google

20   them.

21          THE COURT:  Okay.

22          MR. SCHWAB:  I haven't found anything.

23          THE COURT:  The ICN?

24          MR. SCHWAB:  Yeah.

25          THE COURT:  Well, not everything is on the

1    internet.

2            MR. SCHWAB:  I would hope that the Government

3    regulations are though.

4            THE COURT:  I'm not even sure what ICN stands for.

5    International something number.  Whatever.

6            Okay, so are we considering the case submitted?

7    You have no further desire of submitting any findings of fact

8    or conclusion of law, which I'm not asking for.

9            MR. FANSLER:  The Government is good with it being

10   submitted.

11           MR. SCHWAB:  No, Your Honor.

12           THE COURT:  Okay, we'll be in recess.  I'll take

13   the matter under advisement.  Would hope to have something

14   out in about a week to ten days.

15           MR. SCHWAB:  Thank you, Your Honor.

16           THE COURT:  Thank you all for your presentation

17   today.

18           THE COURT CLERK:  All rise.

19

20                   (Time noted:  11:48 a.m.)

21                       * * * * *

22

23

24

25

1                          CERTIFICATE

2          I, RANDEL RAISON, certify that the foregoing is a

3     correct transcript from the official electronic sound

4     recording of the proceedings in the above-entitled matter, to

5     the best of my ability.

6

7

8     _____          March 11, 2024

9     Randel Raison

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25