1

1                UNITED STATES DISTRICT COURT
                  DISTRICT OF COLORADO

2

3 UNITED STATES OF AMERICA,    .  Case No. 22-po-07015-MEH-1
                           .

4         Plaintiff,         .

5 vs.                   .  Alfred A. Arraj Courthouse
                           .  901 19th Street

6 CHRISTOPHER J. CORDOVA,     .  Denver, CO  80294
                           .

7         Defendant.         .
                           .  September 27, 2023

8 . . . . . . . . . . . . . . . .  1:12 p.m.

9      **TRANSCRIPT OF PROCEEDINGS HELD BEFORE THE HONORABLE**
     **MICHAEL E. HEGARTY, UNITED STATES MAGISTRATE JUDGE**

10

   APPEARANCES:

11

   For the Plaintiff:           United States Attorney
12                             By:  Craig G. Fansler
                            1801 California Street
13                             Suite 1600
                            Denver, CO  80202
14                             (303) 454-0100

15    For the Defendant:          Ascend Counsel, LLC
                            By:  Edward M. Schwab
16                             2401 South Downing Street
                            Denver, CO  80210
17                             (303) 888-4407

18    Also Present:               Christopher J. Cordova

19    Court Recorder:            Clerk's Office
                            U.S. District Court
20                             901 19th Street
                            Denver, CO  80294
21

   Transcription Service:      AB Litigation Services
22                             216 16th Street, Suite 600
                            Denver, CO  80202
23                             (303) 296-0017

24

25 Proceedings recorded by electronic sound recording;
   transcript produced by transcription service.

1                     (Time noted:  1:12 p.m.)

2                THE COURT CLERK:  All rise.  Court is now in

3    session.

4                THE COURT:  Please be seated.  22-po-7015, United

5    States of America versus Christopher Cordova.

6                Please make your appearances.

7                MR. FANSLER:  Good afternoon, Your Honor.  Craig

8    Fansler on behalf of the United States.

9                THE COURT:  Thank you.

10               MR. SCHWAB:  Good afternoon, Your Honor.  Milo

11   Schwab on behalf of the Defendant, Christopher Cordova, who

12   appears in person beside me.

13               THE COURT:  Thank you both.  All right.  We're

14   here for sentencing.

15               You have the floor.

16               MR. FANSLER:  Your Honor, the United States

17   recommends a $5,000.00 fine, and 20 days of imprisonment, as

18   sufficient, but not more than necessary, based on the

19   sentencing factors in Title XVIII of the United States Code,

20   sections 3553(a) and 3572(a), which relates to fines.

21               Three brief points to highlight on the 3553(a)

22   factors before I turn to the fine, Your Honor.

23               The first relates to greed.  The nature of

24   Defendant's conduct in this case is that he repeatedly put

25   his own interests over the public interests.  He didn't care

1   about concerns raised by Social Security customers on August

2   2nd.  His videos show belligerence, and, frankly, animus

3   toward law enforcement officers.  He gets officers' names,

4   badge numbers, and phone numbers, so he can encourage his

5   audience to call and harass the officers and their

6   supervisors, to post on their social media pages, and to file

7   reports with their employers.

8         His actions, as seen in the trial, were calculated

9   to provoke.  He knew before he arrived at the Social Security

10   office that day that he wasn't going to follow any directions

11   or listen to anyone.  His purpose was to get viewers and

12   attention, and get arrested, and that's what he did.

13         His post-arrest conduct is especially troubling.

14   When it comes to that greed factor, it shows the same pattern

15   of caring more about fame and YouTube viewers than the people

16   that he was harming.

17         Exhibit 3 to the Government's sentencing statement

18   is a good example of that.  It's a video of one of those

19   security officers at a day care across the street from the

20   courthouse.  Basically stands outside the courthouse and

21   yells and berates that security officer for 20 minutes, and

22   posts it to his YouTube channel so he can get additional

23   donations from the same event.

24         The Government sends an addendum at ECF 26, again

25   to the same end.  It shows that on August 16th of 2023, so

1    over a year after this conduct, he did almost the exact same

2    thing at the Colorado Springs Public Utilities Commission

3    building.   He showed the same disregard for the public and

4    law enforcement.

5        In that video, which we provide a link in our

6    sentencing statement, you'll see an individual who is

7    actually in the courtroom today who politely comes up to the

8    Defendant and asks him to stop filming him, says he doesn't

9    give him permission to film.   The Defendant yells at him and

10   does a lot of the same things he did a year earlier and

11   before the conviction in this case.

12       Second, Your Honor, turning to the lack of

13   remorse, which the Government views as especially relevant

14   here.   The record shows that he didn't learn anything from

15   his arrest or his conviction here.   He continued to celebrate

16   his crimes post-arrest and post-verdict.   He posted on

17   YouTube statements showing a complete lack of remorse.

18       Just to point out a few examples, again, exhibit

19   3, the security officer at the day care.   The video from

20   August 16th, which I just referred to.

21       And then I think related directly to the crimes

22   for which he was convicted, afterwards he posted a number of

23   short videos and recap videos where he highlighted for his

24   viewers what had gone on, why they should donate, why he was

25   in the right, why he still didn't admit that he did anything

1    wrong.

2             And then during those videos, he also gave links

3    to his merchandise, using the same phrases he used in those

4    videos, again, to drive profits over the people and the

5    agencies and the law enforcement personnel that he had

6    antagonized over a period of time.

7             He has made -- I think it's not too strong of a

8    statement to say he's made his professional brand getting

9    arrested.  He said during the trial that his profession was

10   posting these videos.  Each arrest grosses his audience and

11   his revenues.  He has committed similar crimes four times at

12   the local level after his arrest in this case.

13            MR. SCHWAB:  Objection.  Committed is --

14            THE COURT:  Stand.

15            MR. SCHWAB:  Committed is something that is -- I

16   think he's applying two of those four committed are things

17   that he's been accused of only.  And that is a complete --

18            THE COURT:  Just clarify between convictions and

19   charges.

20            MR. FANSLER:  Sure, Your Honor.  It's all relevant

21   conduct.  He's been arrested four times.  He's been convicted

22   twice.

23            For the two recent arrests, the Government does

24   provide, just for the record today, exhibits that I believe

25   Your Honor has already seen, which is narrative descriptions

1  of those later arrests.

2           So the one on August 16th for filming inside the

3  Colorado Springs Public Utilities Commission building even

4  after he was asked to stop.

5           And the second one relating to filming while

6  officers were conducting witness and victim interviews, and

7  not moving out of the area where the ambulance was pulling

8  up.  That was on September 2nd of 2023.

9           As Your Honor is aware, during sentencing the

10 Government can provide evidence like this to the Court.  The

11 Court just needs to find by a preponderance that there is --

12 that it's relevant conduct, and that there is a minimal

13 indicia of reliability, which those narrative exhibits and

14 officer statements more than provide.

15          I do also have available two clips from the video

16 of his arrest on August 16th that show the lack of remorse.

17 I can play them for Your Honor if that would be helpful.

18          THE COURT:  Please.

19          MR. FANSLER:  Okay.  So the first clip I'm going

20 to play is from that August 16th arrest.

21      (Court confers with Court Clerk)

22          MR. SCHWAB:  Your Honor, I'm going to object to

23 the playing of a clip.  If he's going to play an interaction

24 with an individual, he needs to play the entirety for the

25 purpose of completeness, Your Honor.

1             THE COURT:  Rule 106.

2             MR. SCHWAB:  Yes, Your Honor.

3             THE COURT:  How long is that whole video?

4             MR. FANSLER:  The whole video -- the clip I'm

5    playing is from 26:49 to 28:52, so I'd say it's probably -- I

6    think he gets arrested around the 29:30 mark.

7             The clips I was going to play were about a 2-

8    minute clip leading up to his arrest, and interaction with

9    the customers actually in the courtroom today.

10            THE COURT:  Okay.

11            MR. FANSLER:  At the beginning of the video.  It's

12   about a minute and a half.

13            THE COURT:  You can direct to play whatever you

14   want to play, in addition during your presentation.  Okay?

15            MR. SCHWAB:  All right.

16            MR. FANSLER:  So, Ms. Libid, I'm going to direct

17   to play starting at 26 minutes and 49 seconds of this clip.

18        (Video played in open Court)

19            MR. FANSLER:  So, as Your Honor will recognize, a

20   lot of the language in there very similar to what we saw in

21   the August 2nd video, stated that he just wanted to go there

22   to pick up brochures, but the Agency already told him that he

23   wasn't able to film while he was doing that.  Yet he ignored

24   the law enforcement.  He was arrested right after that, and

25   that's where the narrative picks up.

1     I do note that during the clip, it looked like

2  there was an area that may have skipped.  That was taken --

3  that video was taken from Mr. Cordova's YouTube channel, so

4  that's just the way that the video was on-line.

5     The second clip I'm going to play from that is

6  from -- beginning at 4 minutes and 48 seconds.  This is the

7  interaction with the customer on the -- that he was referring

8  to in that clip, going to 6 minutes and 6 second.

9     (Video played in open Court)

10     MR. FANSLER:  So I have those clips to show -- I

11  think they just demonstrate the lack of remorse, the lack of

12  learning any lesson from what happened, the lack of any care

13  about concerns raised by other people because Mr. Cordova

14  sees YouTube profits and YouTube views as more important than

15  concerns of others.

16     Rather than feeling remorse, he's become

17  emboldened, and these four other arrests show that, because

18  other courts have not imposed any jail time or fines.

19     Third and finally on the 3553(a) factors is the

20  need for deterrence here.  This case presents a high need for

21  specific and for general deterrence.

22     As to specific deterrence, the Defendant has

23  repeated the same petty crimes, very similar petty crimes,

24  over and over.  He's been arrested at least for similar

25  crimes four times after the one in this case.

1    As to general deterrence, the Defendant has posted

2 content, and posted this content to a community of YouTube

3 content creators.  He has told them his sentencing date on

4 those videos.  He's expressed that he's going to keep doing

5 what he's doing.  He's received thousands of views on his

6 arrest videos.

7    He and others, I don't think it's too strong to

8 say, commit crimes like the ones at the Social Security

9 Office for profit.  And he did it because he's seen others do

10 it before him.

11    On the August 2nd video, he talks about seeing

12 another content creator, Bay Area Transparency, doing a

13 similar thing, and that made him think that he could get away

14 with it here just like that individual did.

15    So the general deterrence is important here, and

16 the Government believes that the Court's sentence should send

17 a message to those who are contemplating similar action,

18 about the consequences of putting YouTube fame above the

19 public interest.

20    THE COURT:  So I'm not going to be sending

21 messages today.  I have one case in front of me, and I'll

22 make my decisions made on that case alone.  But I don't think

23 it's the business of Courts to send messages.  Those are

24 politicians, but not judicial officers.

25    MR. FANSLER:  Understood.  I was just making a

 1   point about general deterrence, which 3553(a) --

 2           THE COURT:  But that's the deterrence of this

 3   person, is what I'm concerned with.  Are you saying that

 4   Statute speaks of general deterrence to others outside of

 5   this case?

 6           MR. FANSLER:  Yes.

 7           THE COURT:  Okay.

 8           MR. FANSLER:  I think it does.

 9           THE COURT:  All right.  Thank you.  Anything

10   further?

11           MR. FANSLER:  Yeah.  I just want to turn briefly

12   to the fine, because that does have additional factors under

13   3772, and the Government is seeking a substantial fine here.

14           THE COURT:  Understood.

15           MR. FANSLER:  A $5,000.00 fine here is warranted,

16   because it was a financially motivated crime, and the

17   Defendant profited.  And so a fine is necessary here.

18           Looking at some of the 3572 factors, they include

19   the Defendant's income, earning capacity, ability to pay.

20   The Government provided evidence showing that he had received

21   a substantial amount of money from his YouTube channel during

22   the months when he was posting content related to his August

23   2nd arrest.

24           Another factor under 3572 that's especially

25   important here is not letting Defendant keep illegally

1   obtained gains from their crimes.   The Government provided

2   exhibits 4 and 5 in its sentencing statement to support an

3   approximately $11,000.00 calculation of profits.

4          And as the sentencing statement noted, this is a

5   conservative calculation of profit.   This is what his YouTube

6   channel earned during that period while he continued to post

7   content related to August 2nd.

8          But he had other means of profit.   So on his

9   August 2nd video, Your Honor heard that he preferred people

10  watching his video to donate money through other money

11  transfer apps, like Venmo or PayPal, because those apps

12  didn't take a cut of the money like YouTube did.   Those are

13  not included in the Government's exhibit.

14         He gained new subscribers, or would gain new

15  subscribers and viewers as a result of these videos, that can

16  pay membership fees, can buy merchandise that's marketed and

17  linked on his website.

18         He continued to post related content, like the

19  short videos and the recap videos, and the follow-up video

20  with the security officer when he found him in 2022, and in

21  2023 when he talks about kind of the stage of his Federal

22  proceedings.

23         He continued to post these videos, in short,

24  because it's profitable to do so, because he was getting

25  viewers when he did that.

1               His brand, and the videos on his website show,

2   that his brand has become to get arrested on YouTube to gain

3   profits.  And the sentence today should take those profits

4   away.

5               And for all of those reasons, the Government

6   believes that a fine of $5,000.00, and a sentence of 20 days

7   of imprisonment, is sufficient but not more than necessary

8   under all of the sentencing factors.

9               THE COURT:  Thank you.  You'll have a chance for

10  rebuttal.

11              Mr. Schwab?

12              MR. SCHWAB:  Thank you, Your Honor.  Mr. Cordova

13  will also like to speak.

14              THE COURT:  That's fine.

15              MR. SCHWAB:  The Government puts you in a weird

16  position here, Your Honor.  They raised serious First

17  Amendment issues.  What is similar across these four cases is

18  that he was recording.  But the First Amendment protects the

19  right to record, including the most recent charge, which is

20  recording a police officer in public.

21              He hasn't had the opportunity to face that.

22              THE COURT:  But that's an appellate argument,

23  isn't that?

24              MR. SCHWAB:  Is that an appellate argument?

25              THE COURT:  Correct.  There's a conviction here.

1 There's a conviction.  I'm not going to overturn it based on

2 the First Amendment.  The Appellate Court could, but that's

3 not what we're doing.  I understand.

4 　　　　　But you say a First Amendment problem may be or

5 maybe not, but that's not a consideration for me, is it?

6 　　　　　MR. SCHWAB:  I'm not talking about the conviction.

7 　　　　　THE COURT:  Okay.

8 　　　　　MR. SCHWAB:  I'm saying that the Government is

9 asking you to impose, and in fact changed their stance on

10 sentencing, on the basis that Mr. Cordova continues to video.

11 Not that he continues to go into public facilities, into

12 Social Security Offices or other Federal facilities under

13 this, it's that he just generally is out recording, and

14 sometimes gets arrested by police officers for interference.

15 　　　　　What is the common thread here?  That he's

16 filming.  He's filming police officers and other public

17 officials.

18 　　　　　THE COURT:  But isn't it also a common thread that

19 those people allow him to film up to a certain point, and he

20 crosses a line that they believe exists?  They tell him

21 that's the line.  You can film here, you can't film there.

22 That's one thing they're arguing.

23 　　　　　The other thing they're arguing is that this is

24 not a pure First Amendment motive.  They are strongly arguing

25 that this is for money.

1              Now, a purist First Amendment activist doesn't do

2  it for money.  They do it for principle.  Right?

3              MR. SCHWAB:  Sure.

4              THE COURT:  Would you agree?

5              MR. SCHWAB:  And I think that Mr. Cordova does

6  this for principle.  And, you know, aspersions aside, he is

7  out there putting himself in -- you know, in potential legal

8  jeopardy because he believes in the principle that public

9  officials, not just police officers, but public officials at

10  large, when they are in public spaces, including the public

11  lobbies of a utility, a public utility, which is a publicly

12  owned building that is a sub-division of the City of Colorado

13  Springs, --

14              THE COURT:  My Chambers is publicly owned.

15              MR. SCHWAB:  Sure, but that's a private --

16              THE COURT:  Can your client walk back into my

17  Chambers freely?

18              MR. SCHWAB:  No.

19              THE COURT:  Why not?

20              MR. SCHWAB:  It's different than a public lobby.

21              THE COURT:  Well, I agree.

22              MR. SCHWAB:  And but beyond that, --

23              THE COURT:  We've already crossed that bridge,

24  though, here.  You argued that what he went in to was a

25  lobby.  I found that it wasn't.  He was in a lobby, but he

1  moved into an area where they do the business with the

2  customers.  So we're beyond that.

3           MR. SCHWAB:  So would you like -- I mean, do we

4  want to rule today on whether this lobby functions -- this

5  lobby in Colorado Springs --

6           THE COURT:  No, no.  You mean the subsequent

7  alleged offense?

8           MR. SCHWAB:  Yeah.  I'm talking about Colorado

9  Springs.

10          THE COURT:  Sure.

11          MR. SCHWAB:  Which is the basis for which the

12 Government moved from community service to asking for a jail

13 sentence.

14          THE COURT:  Understood.

15          MR. SCHWAB:  So that means the Government's

16 premise on seeking this punishment now is based not on his

17 conduct in the Social Security Office, but subsequent conduct

18 based on his recording, conduct for which he has not yet had

19 the opportunity to contest.  He hasn't even had a -- he had

20 his first appearance this week, in fact, for both of these,

21 and he has not had the opportunity to go to trial.

22          He has defenses to be raised, and, as I mentioned

23 last time, one of the concerns I have with the Government's

24 position here on bringing these new things in as a basis for

25 their argument on sentencing, is he has due process issue, he

1  hasn't had the opportunity to present his defense, which

2  include First Amendment defenses on these subsequent charges.

3          He has a potential double jeopardy argument.  If

4  you sentence him to jail on the basis that he has been

5  charged with these crimes, --

6          THE COURT:  Well, I couldn't do that.  Any

7  sentence is --

8          MR. SCHWAB:  That's what the Government has asked

9  you to do today.

10         THE COURT:  Okay.  So just like any detention or

11  incarceration consideration, they're using provisions in the

12  law that I can consider, but not the basis for the -- the

13  legal basis for whatever I do is the underlying conviction

14  solely.

15         MR. SCHWAB:  I understand.

16         THE COURT:  Okay.

17         MR. SCHWAB:  But if the Government's position is

18  you should charge him -- you should sentence him to jail now,

19  because he's been charged with filming in a public space, and

20  then he goes and wins that case, but you've sentenced him to

21  jail because of this added conduct that the Government now is

22  basing their request for jail time, he's now been sentenced

23  based on conduct for which he's later acquitted, but will

24  serve a sentence under this.

25         THE COURT:  Well, so, you know, I did ask for a

1  criminal history.

2          MR. SCHWAB:  Sure.  And I'm talking about -- I'm

3  solely focused on subsequent conduct for which the Government

4  bases its entire argument for jail time.

5          THE COURT:  I understand.  But you're not

6  disputing I can take his criminal history into consideration,

7  are you?

8          MR. SCHWAB:  I am not.

9          THE COURT:  Okay.

10          MR. SCHWAB:  I am not, Your Honor.  And I'd be

11  happy to talk about the only two instances that he has any

12  criminal history in the decade before this incident.

13          One of them was filming in a city hall lobby,

14  because he believes that there is a right for the citizen,

15  for citizens to film non-disruptively in a city council or

16  city hall lobby.  That's what he was doing.

17          The second one was he was filming a police van,

18  police doing the speed enforcement with video tickets.  He

19  was recording that, and he got charged with I think

20  interference with a police sign or something.

21          All again related to his political activity and

22  his news gathering activity, which is protected under the

23  First Amendment.

24          You heard even in that clip "I'm here to collect

25  brochures and things."  We don't know if there are other

1    instances where he does go in because the Government hasn't

2    produced those, where he goes into public lobbies like this,

3    shows the public lobby for the viewers, collects those

4    brochures, and walks out without incident.  It's only when

5    these officers confront him.

6              THE COURT:  I'll watch or listen or read anything

7    you submit that you believe is relevant.

8              MR. SCHWAB:  Sure.  I don't think any of that is

9    relevant in truth.  I don't think that this is relevant.

10             And, like I said, I think that it raises serious

11   issues.  The Government's stance and conduct in raising

12   subsequent offenses, I think raises serious issues under the

13   First Amendment and under the Fifth Amendment, both from a

14   due process and a double jeopardy perspective.

15             And I don't know how you can un-do that web here.

16   The Government first asked for community service, and then on

17   the sole basis of subsequent charges asked to impose jail

18   time.

19             THE COURT:  But I'm not bound by a recommendation

20   from the United States Government, or from you.

21             MR. SCHWAB:  I agree.  But it muddies --

22             THE COURT:  I have my own independent decision to

23   make.

24             MR. SCHWAB:  I agree.  But, however, the

25   Government's stance certainly clouds this water as to the

1  basis for your decision making.  It is now introduced in the

2  Government's stance is he should be punished for subsequent

3  offenses for which he has not been convicted.

4          THE COURT:  Punished more severely.  They have

5  always argued he should be punished.

6          MR. SCHWAB:  Sure.  They are now arguing that he

7  should be punished much more severely for conduct for which

8  he has not had the opportunity to address.

9          And I raised that the last time we were here, that

10 if Your Honor would like to have a trial within a trial to

11 really evaluate his conduct in these two other incidents,

12 you're welcome to do that and spend the next two hours, three

13 hours, having this trial or these two trials within trials.

14         THE COURT:  But there were two convictions.

15         MR. SCHWAB:  Yes.

16         THE COURT:  For activity that occurred after the

17 activity here.

18         MR. SCHWAB:  I would have to look at the timing.

19 I think yes.

20         THE COURT:  So the activity for one was December

21 of '22, and the activity for the other was March of '23.

22 Both resulted in convictions, correct?

23         MR. SCHWAB:  Sure.  But the Government didn't even

24 talk about those.  They're talking about and showing video

25 from subsquent.

1                THE COURT:  Understood.  So you're asking me to

2   disregard that?

3                MR. SCHWAB:  The subsequent activity, of course.

4                THE COURT:  This what I saw today?

5                MR. SCHWAB:  Yes.  And the Government -- that's

6   all subsequent to your enter of conviction -- your entry of

7   conviction.  It's all subsequent to that.

8                And like I said, those are still pending cases.

9   He has only been accused of these issues -- of these crimes.

10               But the Government's request, and I think any jail

11  time, therefore, would violate Mr. Cordova's rights under the

12  First and Fifth Amendments.

13               They never asked for that prior to these

14  incidents, and they've only asked for that on the basis of

15  these incidents.

16               So I think that jail time here would be a grave

17  injustice.  And, like I said, and potentially implicate a

18  violation of Mr. Cordova's First and Fifth Amendment rights,

19  because he has the right to contest and to challenge those

20  convictions on a First Amendment basis, as well, since he was

21  recording, one of which was outside in public.

22               Police officers, unfortunately, and far too often,

23  arrest individuals filming on the side of the street and call

24  it interference.  That is -- I have gone to trial on that

25  five or ten times at this point, because unfortunately

 1  officers, not all, but some do not like to be recorded.

 2          But recording officers in public, especially when

 3  they're outside interacting with people, is necessary.  If we

 4  would not have seen the abuses of the police system without

 5  recording, without Rodney King, without George Floyd, these

 6  are issues.  And that is part of why he's out there recording

 7  both in and out of public buildings.

 8          But never in private buildings.  He's never

 9  walking back into people's offices.  He's never doing

10  anything like that.

11          THE COURT:  So let's talk about that for a second.

12          MR. SCHWAB:  Sure.

13          THE COURT:  Those filmings you're talking about,

14  which are quite different --

15          MR. SCHWAB:  Yes.

16          THE COURT:  -- than what we're dealing with here.

17          MR. SCHWAB:  Two of the four incidents that people

18  talk about --

19          THE COURT:  Right.

20          MR. SCHWAB:  -- are filming outside.

21          THE COURT:  The purpose was to record what was

22  seen as Constitutional violations by the police.  Agreed?

23          MR. SCHWAB:  Yes.  At least as a possible --

24          THE COURT:  Sure.  The Fourth and Fifth

25  Amendments, excessive force?

1    MR. SCHWAB:  Sure.  Well, as a general induced

2  gathering.

3    THE COURT:  Maybe even racial discrimination.

4  Those were those allegations.

5    What are the allegations of Government wrong doing

6  that your client is filming?

7    MR. SCHWAB:  Oh, it's not to say that he's there

8  to respond to an allegation of wrong doing.  He believes that

9  the Government works for us, and when they're conducting

10  business in a public lobby space, when there are brochures,

11  that as a news gathering function, --

12    THE COURT:  What is the news, though?  That's what

13  I'm interested in your perspective on the news.

14    MR. SCHWAB:  He tours public facilities and

15  gathers pamphlets and things.

16    THE COURT:  What is the --

17    MR. SCHWAB:  He's not necessarily sitting there

18  and just -- you know, and certainly the Government has never

19  provided you any evidence that he's trying to record people's

20  private information, that he goes up to screens and looks at

21  their credit cards, or anything like that.

22    What you see is that he walks into a general

23  public lobby in a publicly owned space.  We don't know, for

24  example, if there is a regulation in place always, you know.

25    But in particular, the Statute that we're talking

1   about -- not the Statute, but -- yeah, the Statute in the

2   Federal level, it's really not about recording.  It's about

3   -- well, I guess it is about recording.

4           But it is distinct from the conduct he's been

5   accused of in the rest of these.

6           THE COURT:  You still didn't answer what the news

7   value is.  Certainly reporting on something is intended to

8   provide value to whoever looks at it.

9           MR. SCHWAB:  Sure.

10          THE COURT:  What is the news value of the Social

11  Security Office or the Public Utilities Office?

12          MR. SCHWAB:  You know, I can't say.  But I don't

13  think that I or you, respectfully, should be judging the

14  value of the content.

15          THE COURT:  No, you proffered the information.

16  I'm asking you to explain what you said.

17          MR. SCHWAB:  I'm saying that I don't think we

18  should be making determinations on the respective value of

19  the content.  If he has a good faith argument and a good

20  faith belief that what he is doing is gathering news, whether

21  that's truly valuable news or not, is just -- it's

22  unnecessary, it's outside of the bounds of whether that

23  actually is protected by the First Amendment.

24          The quality of the speech is not an issue.  It's

25  just whether there is speech.  And if he is attempting to

1   gather news, whether it's valuable or not, once we start

2   deciding yes that is true news gathering and that's not

3   really what's interesting about going in there.  Now we're

4   engaged in content and viewpoint.

5           THE COURT:  No, but credibility is always an issue

6   in a courtroom.

7           MR. SCHWAB:  Sure.  Yeah.

8           THE COURT:  And if you say I'm gathering news, and

9   if you can't possibly identify what news you're gathering,

10  that's a credibility issue more than anything.

11          MR. SCHWAB:  And Mr. Cordova obviously can speak

12  to this more than I can.

13          THE COURT:  Okay.

14          MR. SCHWAB:  But is this a good faith effort to

15  gather information, including pamphlets, including how these

16  officers work, and how people can engage with them?  Viewers

17  potentially could engage with this office, what it's like to

18  go there.  I can speculate, certainly.

19          THE COURT:  I think you are.

20          MR. SCHWAB:  Oh, of course I am, because you know

21  what?  I'm not the one out there doing it.

22          THE COURT:  Sure.

23          MR. SCHWAB:  My interest in this side of it is

24  right here.

25          But the through thread here is truly that he's

1   filming public officials.  There is no allegation that he's

2   gone to another Federal facility.  The video they talk about

3   with the day care, I don't -- I've never seen a day care in

4   that video.  He doesn't go inside.  And, in fact, the

5   suggestion that he found this guy, it looks like he walked

6   out of this courtroom, perhaps, and saw that security guard,

7   and filmed him on a public sidewalk.

8          THE COURT:  Well, I think the last clip he was

9   filming a person who is not a public official, and the

10  person's son.

11         MR. SCHWAB:  And I'd be happy -- and the

12  Government's -- I'm happy to get to that.  The Government's

13  representation to you is -- call it misleading, to say that

14  he accosted this individual.  We should watch -- let's watch

15  the whole interaction.  It starts at, I believe, 4:40.

16         And, again, this is also subsequent.  This is an

17  event that's subsequent, and I think any consideration of

18  this is significantly prejudicial and problematic from the

19  perspective of --

20         THE COURT:  I will not find that you're waiving

21  any argument by playing more of the clip.

22         MR. SCHWAB:  Okay.  But I do think we need to play

23  it for totality, because the Government's suggestion to you

24  that Mr. Cordova accosted this individual is just flat out

25  wrong.

1              In fact, why don't we go back to 4:15, just so you

2    can see about 30 second beforehand.

3        (Video played in open Court)

4              MR. SCHWAB:  It's earlier than that.  I'm

5    obviously working from a different video than you.

6              THE COURT:  Sure.

7              MR. SCHWAB:  We can just watch it from the

8    beginning.  I think it's only a two or three minute video.

9              THE COURT:  Fine.

10       (Video played in open Court)

11             MR. FANSLER:  Your Honor, just briefly.  If he's

12   going to play that, I would just like a copy.  Note that I

13   haven't seen the full video.

14             THE COURT:  Sure.  Was there a discovery order in

15   this case?

16             MR. FANSLER:  No, there wasn't.  I was just saying

17   -- and I don't need it in advance, I would just like the full

18   copy.

19             THE COURT:  Fine.  Yes, since it's being shown in

20   Court, it will be part of the record.  I think that would be

21   fine.  Thank you so much.

22             MR. FANSLER:  That's fine.

23       (Pause)

24       (Video played in open Court)

25             THE COURT:  We've already seen that.

1          MR. SCHWAB:  I think we can stop there.  I think

2    he leaves a few minutes after this.

3          But you've seen the interaction.  Did Mr. Cordova

4    accost him?  No.  He never follows him, he never goes up to

5    him, he never starts any engagement.  Every time it's this

6    guy coming up aggressively, getting in his face.

7          In fact, Mr. Cordova doesn't initiate any

8    interaction with any of these individuals you see.  He says

9    "I'm here to tour the facility."

10         Again, all of this is completely irrelevant, and

11   the consideration of any of this raises serious

12   Constitutional issues.

13         But I just wanted to call attention to the United

14   States' brief saying that Mr. Cordova accosted him to

15   question their credibility and what they represent to you

16   about his intentions and all of the things that they know

17   that he did.  He didn't accost him.  He was accosted.

18         Mr. Cordova has a political respect here.  It is

19   that a public sphere, including public spaces of buildings,

20   but the streets, everywhere else, that the best disinfectant

21   is sunshine, and that he does so with his camera.

22         THE COURT:  That disinfectant is what?

23         MR. SCHWAB:  Sunshine.

24         THE COURT:  Oh.

25         MR. SCHWAB:  That he does so with his camera, and

1    does he push boundaries?  Sure.  That's how we learn what our

2    rights are.  There is a raging debate across the Circuits in

3    this country, in the First, Third, Seventh, Fifth, Seventh,

4    Ninth, Tenth now with *Irizari v. Mejia,* and the Thirteenth.

5    They go to different lengths on the right to record in public

6    spaces and public officials.

7              THE COURT:  There is no Thirteenth Circuit.

8              MR. SCHWAB:  What's that?

9              THE COURT:  It stops at Eleventh.

10             MR. SCHWAB:  Oh yeah, you're right.  I don't know

11   why.  I mean, there are thirteen, but you're right.  Sorry

12   about that.

13             In my mind, I was like it's all the odds, and then

14   we got to --

15             THE COURT:  D.C., and Federal.

16             MR. SCHWAB:  Yeah, I know.

17             THE COURT:  Okay.

18             MR. SCHWAB:  I apologize.  There is a raging

19   debate on the limits in the -- not really the limits, but how

20   far the person and extent.  Does it extend to public lines?

21   Does it extend to public officials outside of police

22   officers?

23             That is a live issue in this society.  And to seek

24   to punish people for that is problematic.

25             When Mr. Cordova went to the Social Security

1  Office, he didn't try to film anyone's personal information.

2  He didn't try to egg people on.  In fact, he was very clear

3  "I don't believe that this regulation is Constitutional, that

4  my First Amendment rights allow me to go in to this -- past

5  this door to report."

6          You've answered in the negative.  But we wouldn't

7  know if you hadn't done so.  But it was not an aggressive

8  thing.

9          The people -- the United States cast aspersions

10 all over the place for his motive, but his motive is sincere,

11 that he wants to bring more public interactions in the

12 provision of public services in public spaces to the public.

13         There would be -- now, the nature and

14 circumstances of the offense, as I'm just discussing, are not

15 severe.  He didn't do anything other than a technical

16 violation of that Statute.  Perhaps he didn't know beforehand

17 that there was a question as to whether doing so violated a

18 Federal petty offense.

19         But he was clear that he believed that the First

20 Amendment protected.  And what did he do?  He walked in and

21 was arrested.  He did not engage, he did not yell at people,

22 he did not disrupt, he did not try to get personal

23 information, he didn't go over and film on someone's

24 handwritten thing.  He walked in, and I believe even in that

25 video, he says "I'm here to get pamphlets."

1          And under the first factor under 3553, the nature

2     and circumstances of the offense are so minor as to make any

3     sentence of jail or significant probation or public service

4     even, inappropriate.

5          Under 3553(2)(a), similarly, the seriousness of

6     the offense.  It's not a serious offense.

7          And just to go back, I think that is where you

8     would consider his deep held belief in efforts to push the

9     boundaries of what the First Amendment protects.  We'll call

10    into question that that is the nature and circumstances of

11    this offense.

12         Now, the seriousness, as I mentioned, he didn't do

13    anything that would cause concern.  It was maybe some

14    perspective or speculative concern that there might be in the

15    future that he or potentially another individual might go in

16    and try to collect personal information.  But he certainly

17    didn't in this incident.

18         Under 3553(b) -- or 3553(2)(b) and (c), to call

19    this criminal conduct is an exaggeration.  This is much more

20    akin to a civil offense, a civil infraction, a technical

21    violation of where you are or are not allowed to record.

22         There is no violence, there is no, you know,

23    potential for deep community harm here.  This is someone that

24    is trying to push the bounds of what the First Amendment

25    protects, similar to a protester in the streets, maybe on

1   Federal property, you know, on the steps of the Supreme

2   Court, trying to push the bounds of what is a forum.

3          But to the degree the United States asks you to

4   deter him, they're not asking you to deter him from criminal

5   conduct.  They're asking you to deter him from all filming.

6   All filming of public officials, of public spaces.  They

7   don't make a distinction between lobbies and police on the

8   street.

9          And that's the concern here, is that that effort

10  in deterrence may go beyond deterring him from committing

11  serious offenses, and instead deter him from engaging in

12  protected activity.  And yes, sometimes that line between

13  what is protected and what isn't is really hard to know.

14         But considering that, that pushes that bounds.

15  That calls into question whether what we're deterring here is

16  protected activity, as well.

17         Accordingly, an imposition of a sentence of jail

18  is incredibly out of line and out of -- it's just

19  unnecessary, and would an exaggerated thing.

20         I'm going to ask that you impose 20 hours of

21  community service.  One month of full working time of

22  community service, the United States' last offer was also

23  incredible.  This is the lowest Federal offense.

24         And as we've seen, this is not a malicious

25  individual.  This is someone who is out, maybe wrong, maybe

1  misguidedly, but in a good faith belief that he is engaged in

2  protected First Amendment activity.  And that would support

3  an imposition of only 20 hours of community service.

4           Relating to the request for a $5,000.00 fine, the

5  United States says that Mr. Cordova made $11,000.00 off this,

6  yet they take a long period of time in all videos and all

7  content protected activity, other engagements that were

8  protected, and they just lump it all in.

9           In fact, if you look over, they only say that I

10  believe $872.00 were related to this and those videos that

11  were related to this.

12           Yes, he has catch phrases from his protected

13  activity, too.  Things that he says in video after video

14  after video, "do better."  Sometimes, you know what, police

15  officers do need to do better.

16           And to try to impose a fine on the basis that he

17  sells merchandise, that is stretching the bounds of saying

18  that he is getting ill-gotten profits.  If you want to impose

19  a fine on the basis of ill-gotten profits, $872.00 is -- I

20  apologize.  I have to look back, but I believe that is the

21  right number.  It is exceedingly low.  There are many, many,

22  many dates, and the people got those records from YouTube.

23  They could have gotten any records they wanted to, but they

24  only got the records from YouTube.

25           Many of those dates it's a penny.  He makes a

1   penny that day.  He makes two pennies that day.  $11,000.00,

2   that's like saying, you know, you got into a car accident,

3   and therefore every time you've ever gotten into the car

4   should count for, you know, the charges.

5           Now, I'm going to let Mr. Cordova speak to his

6   income.  There is no restitution to be considered in this

7   case.

8           And as you'll hear, Mr. Cordova does make -- have

9   a significant income that can support this type of award --

10  this type of fine.

11          That's why I'm going to ask you to not impose any

12  fine here.  But if the Court is determined to issue a fine,

13  then it should be limited to the actual profits from that

14  video, and nothing more.

15          I'm going to let Mr. Cordova speak directly to

16  you.  Thank you.

17              THE COURT:  Thank you.

18              MR. SCHWAB:  Do you have any other questions?

19              THE COURT:  I do not.

20              MR. CORDOVA:  Hi.

21              THE COURT:  Good afternoon.

22              MR. CORDOVA:  The first thing I'd like to do is to

23  answer your question about what I do as far as gathering

24  news.

25              So I do more than -- so there's lots of titles for

1    what I do, and I give myself the title of a civil liberties

2    activist.  Okay?  And so I do actual stories where I just

3    covered a story in Edgewater where there was a murder, and

4    the man was pepper sprayed, and then he was shot in the back

5    twice.  And that's been over five months ago, and still no

6    charges have been brought against the man who murdered him.

7         I do actual news.  And when I was in City Hall for

8    the arrest that the U.S. Attorney is bringing up for

9    Sheridan, the reason why I was there is because I'm actually

10   trying to do public records requests.  So for the van that my

11   attorney was speaking of, there was a public employee who was

12   taking pictures of me.

13        And so this is news also when I'm recording the

14   van, you know, like this is, you know, they take pictures of

15   you and they send you fines.  My viewers are interested in

16   that type of information.

17        But she got out of her vehicle and started taking

18   pictures of me.  So if she's in her official capacity and

19   she's taking pictures of me, that's a public record she

20   created.

21        So I went to the City of Sheridan to do a public

22   records request, which I think it's CCJRA, it's not CORA, so

23   it's a little bit differently written, but they have a

24   reasonable amount of time to respond to it.  And three months

25   went by with no response.  They just completely ignored it.

1    So when I go back in to the City Hall, that's my

2  business.  I'm documenting my interactions with government.

3    And so I was dealing with the City Attorney, I was

4  dealing with people giving me the run around.  Like I said,

5  several emails.  Months and months and months had gone by

6  with no response in regards to my records request.

7    And so eventually it got to the point where we

8  were going there all the time to say "hey, we have a lawful

9  right to get these records.  This is my news that I'm

10  reporting on."

11    And it got to the point where they just didn't

12  like it anymore, so then they just drafted up an

13  administrative order that the City Attorney did that states

14  that there's no recording.  Basically, they ban recording in

15  a public space.

16    So there is no CFR like there is in the Social

17  Security Office that says that you can't record in City Hall.

18  In fact, City Hall is widely known to be -- people record in

19  City Halls all the time.  So that's what happened.  So that's

20  what happened with that one.

21    But a lot of my news purposes really, like my

22  attorney said, is to stress test the First Amendment.  And so

23  when I'm out here and I'm doing my work, I'm doing it because

24  I believe in what I'm doing, and I'm trying to create case

25  law in the State of Colorado.

1          And I'm not here -- like there's people in this
2    courtroom, and the U.S. Attorney said that I'm here
3    specifically to get arrested so I can profit from my arrest.
4    I lost money from these arrests.  I didn't gain money.
5          And there's all the people in the courtroom that
6    would say that I'm just here for clicks and views to make
7    money on YouTube, and I don't care about people's rights.
8          Well, if that was the case, then I made a really
9    bad career change, because I took a huge pay cut to do this.
10   I've been doing this full-time now for two years.  I made
11   $22,000.00 last year from YouTube.
12          I live in poverty.  I went from being an
13   electrician to making a good living to struggling.  And not
14   to say that I don't want to make money.  Yes, I ask for
15   donations.  My supporters, if they want to donate, it's not
16   required, but yes, they can donate.
17          He brought up Venmo or PayPal, yes, because
18   YouTube takes about 40 percent of those donations.  So yes,
19   if you want to donate, you can donate to me directly and more
20   money comes to me.
21          But there is a lot of costs associated with
22   fighting for your rights.  I've been arrested and locked in
23   cages several times now, and I have to pay for bond, I have
24   to pay for my attorney.
25          And, yes, like you said, that you would consider

1  my past criminal history, and I have been -- I'll be up-front

2  with you, you already know, I've been in trouble with the law

3  a lot as an adolescent.

4          THE COURT:  Well, in your 20s.

5          MR. CORDOVA:  In my 20s, yeah.  In my 20s.

6          THE COURT:  That's not an adolescent.

7          MR. CORDOVA:  Early adulthood, I guess, right?

8          THE COURT:  Yes.

9          MR. CORDOVA:  It did take me a little bit longer

10  to grow up than others, but I finally did.  And I haven't --

11  my last charge was from 2009, I believe.  And all of my

12  charges now within the last 15 years have been from my

13  activism.

14          So, you know, I -- the fact that there is, you

15  know, the U.S. Attorney and so many people out there who

16  think that I don't care about rights and I'm just here just

17  to make money, that's absolutely not true.  I honestly feel

18  like the Constitution, it's like a protein shake.  You can't

19  just drink protein shakes and get buff.  You have to

20  exercise.

21          So if you don't exercise your rights, they are

22  just words written down on a piece of paper.

23          And so, you know, I'm not here just to make money.

24  The real reason why I do this is because every American's

25  rights are more important than my paycheck.  That's why I

1  made $22,000.00 last year, and the only reason I'm able to

2  survive is because I have good credit.  And I'm selling my

3  condo now so I can pay off my debt.

4         So, you know, I would like to also tell you that I

5  appreciate during the trial that you were asking my attorney

6  clarifying questions, and I really felt like you were really

7  trying to understand our argument.  So I do appreciate that,

8  because I have been in courtrooms and bench trials before,

9  like the attorney brought up, in Sheridan, the interference

10  charge where there's a municipal charge.  I was guilty before

11  I even walked in there.  You could tell.  So I do appreciate

12  that.

13         But the thing is that we disagree on the fact of

14  whether that space that I went to was a lobby.  I believe

15  that it was a lobby and they were conducting business in a

16  lobby.  You disagree, and that's your opinion.

17         And I understand that your opinion is the only one

18  that matters today.  So moving forward, I plan to be more

19  cognizant of where I record on Federal property, because this

20  is a learning experience for me, too.  I'm not perfect.

21         The things that I do are not to maliciously break

22  the law.  I do them because I believe they are lawful, and I

23  believe they are just.

24         So how do I fight for people's rights?  I do that

25  by engaging in civil disobedience.  So in the '60s, Rosa

1  Parks was thought of as a trouble maker.  But today, she's

2  regarded a hero.

3           THE COURT:  But what rights are you fighting for?

4  That's what I don't understand.

5           MR. CORDOVA:  Oh.  Yeah, sure, absolutely.  So I'm

6  fighting for mainly the First Amendment right to record in

7  public, right?

8           But so like the interference charge, so if I'm

9  recording and the police officer -- there's no Supreme Court

10  ruling that I know of that says you have to be X amount of

11  feet away.  He wanted us specifically because we had cameras.

12  There was other people all around to be further back.

13           And so to interfere, I have to use force, threaten

14  to use force, physical interference, or an obstacle, to

15  prevent him from doing his job, which I wasn't doing.  I was

16  already behind the ambulance.

17           And so I believe that was an unlawful order.  But

18  then when he gave the order and started counting down from

19  five, I actually was in the process of moving back.  I was

20  obeying his order, but by the time he got to one, it was a

21  very fast countdown, I wasn't back fast enough.  I got

22  arrested.

23           But again, like my attorney said, that doesn't

24  have any relevance here.

25           But the rights that I'm fighting for are not just

1   the First Amendment right.  It's our lawful right to obtain

2   information through CORA, like I was saying.  There's several

3   -- since I've been doing this for two years, I've been denied

4   public records requests or ignored of them.

5           I'm trying to educate my audience about

6   transparency and how you go about doing these things, and how

7   you do public records requests, and why I do those.

8           And so just recently there was a video -- there's

9   actually a gentleman here who is the librarian of the library

10  that we were at.  And a public employee was taking pictures

11  of me, and so I did the public records request and they said

12  there is no picture, even though she admitted that she was

13  taking a picture of me, and then I saw her phone.  I had a

14  picture of her phone, but on record mode.

15          So CRS 18-8-114, which is abuse of public records,

16  an employee knowing they don't have the authorization to do

17  so deletes, mutilates, or destroys, any public record, that's

18  a misdemeanor crime punishable up to 120 days in jail.

19          So these are the types of things, like I'm here to

20  engage in a First Amendment protected activity and to educate

21  that we have a right to record in a public space.  But when

22  another opportunity arises for me to educate my audience on,

23  let's say public records requests, and how it's against the

24  law for public officials to delete stuff out of their -- even

25  if it's a personal cell phone, I take that opportunity to

1   educate my audience.

2           It's not just the First Amendment.  It's all kinds

3   of stuff.  I just kind of play it by ear and I try to learn

4   as much as I can from my attorney, from others in this

5   community, from my own audience that I learn from.  I have

6   police officers who used to record with me.  I have my friend

7   here who served in Iraq.

8           So we have a lot of police officers that agree

9   with what we do and say "man, you know, the reason I watch

10  your videos is because it just disgusts me the way some of

11  these -- not all, but some of these officers treat the

12  public."

13          And they swear an oath to the Constitution.  And

14  if you swear an oath to the Constitution, it doesn't give you

15  much credibility when you just enforce your feelings or, you

16  know, you arrest someone because you claim that they're

17  interfering when they're not really interfering.  Right?

18          So like my attorney said, even if you don't like

19  what I'm doing, you swore an oath to protect that.

20          So just in conclusion, that's the real reason why

21  I'm here, Your Honor.  I don't make a lot of money.  I can

22  prove it to you.  I made -- I'm sorry I didn't make more

23  money now, actually, but I've been consistently making about

24  $1,200.00 to $2,000.00 a month, and I've got to pay taxes on

25  that, too.

1          So like I said, my tax return for last year, 2022,

2    was $22,000.00.  So the last two years I've racked up

3    $60,000.00 in debt in order to do this because, again, I

4    believe in this.  And my rights and your rights and everyone

5    in here's rights, even the people that don't like me, are

6    more important to me than my own paycheck.

7          So with that said, Your Honor, thank you for your

8    time.  And, again, thank you for hearing our side and really

9    listening to understand what we had to say.  I do appreciate

10   that.

11         And that's it.  Thank you.

12         THE COURT:  Thank you.  You may wrap it up.

13         MR. FANSLER:  Yes.  Just a couple of legal

14   responses, Your Honor.

15         One is the importance of considering post-arrest

16   and even post-conviction conduct.

17         The Tenth Circuit is very clear on that, as is the

18   Supreme Court.  I can give you one case cite, which is *United*

19   *States v. Lente,* 759 F. 3d 1149, the pin cite would be 1167-

20   1168, which calls that kind of conduct highly relevant, and

21   says that it's very important when a court gets the most up-

22   to-date picture possible of a defendant's history and

23   characteristics.

24         So that one wasn't even charged conduct.  It was

25   prison disciplinary records that enhanced the sentence.

1          And what those Courts find out when actually it's

2    different, that it's even post-sentencing that's later

3    vacated.  That post-sentence conduct is even important.  So

4    the Tenth Circuit is very clear on that issue, and that's why

5    the United States believes that the additional arrests are a

6    reason why he should have a prison sentence here.

7          You've seen the full video clip was kind of

8    illuminated.  The Government's main point was that these

9    interactions do show that it's the Defendant's interests that

10   matter.  I mean, when he came in, he was immediately told by

11   the security officer "don't film in here."  He then had the

12   interaction with the other individual.  All of those were

13   disregarded.

14         And just to address briefly the point about the

15   Government is asking you to penalize him for filming.  That's

16   never been what the Government has asked to do.  We've asked

17   that he be punished for crimes he's been arrested for, that

18   he seems to do them because he wants to post them, and that

19   seems to be the incentive to do them.

20         But we're not asking to penalize the filming,

21   although if the Court were inclined to impose a sentence of

22   probation, then we do think that there should be a

23   occupational filming restriction in there.

24         That's all.  I don't -- I think Your Honor has

25   heard all of the other arguments.  I just wanted to briefly

1    address those legal and other arguments.

2          THE COURT:  Okay.  Thank you.  This is United

3    States versus Christopher J. Cordova, 22-po-7015.

4          The Court finds that the information in the record

5    consisting of the information charging document that was

6    filed, the Court verdict, and the Government's sentencing

7    statement, enables the Court to exercise its sentencing

8    authority under 18 U.S.C. section 3553, without a full pre-

9    sentence investigation report, although there was a pre-

10   sentence report of some nature here.

11          Therefore, the Court will proceed to sentencing.

12          Pursuant to the Sentencing Reform Act of 1984, it

13   is the judgment of the Court that Defendant Christopher J.

14   Cordova, for count one, is hereby committed to the custody of

15   the Bureau of Prisons to serve a term of 15 days, and to be

16   placed on probation for a term of two years as to count two.

17          As to count one, no term of supervised release is

18   imposed, as supervised release is not authorized for class C

19   misdemeanors, infractions, or petty offenses, pursuant to 18

20   U.S.C. section 3583(b)(3).

21          As to count two, while on probation supervision,

22   Mr. Cordova, you must not commit another Federal, State, or

23   local crime, and must not unlawfully possess a controlled

24   substance.

25          You must refrain from any unlawful use of a

1  controlled substance.  You must submit to one drug test

2  within 15 days of placement on supervision, and a maximum of

3  20 tests per year of supervision thereafter.

4           You must pay the assessment imposed in accordance

5  with 18 U.S.C. section 3013.

6           This judgment does impose -- I will impose a fine,

7  so you must pay it in accordance with the Schedule of

8  Payments sheet of this judgment.

9           You must notify the Court of any material change

10 in your economic circumstances that might affect your ability

11 to pay restitution -- excuse me, no restitution.  A fine or

12 special assessments.

13          You must comply with the standard conditions

14 adopted by this Court pursuant to General Order 2020-20, as

15 listed below.

16          You must report to the probation office in the

17 Federal judicial district where you are authorized to reside

18 within 72 hours of the time you are sentenced, or 72 hours of

19 your release from imprisonment in supervised release cases,

20 unless the probation officer instructs you to report to a

21 different probation office or within a different time frame.

22          After initially reporting to the probation office,

23 you will receive instructions from the Court or the probation

24 officer about how and when you must report to the probation

25 officer, and you must report to the probation officer as

1    instructed.

2         You must not knowingly leave the Federal judicial

3    district where you are authorized to reside without first

4    getting permission from the Court or the probation officer.

5         You must truthfully answer the questions asked by

6    your probation officer.

7         You must be at a place approved by the probation

8    officer if you plan to change where you live or anything

9    about your living arrangements, such as the people with whom

10   you live.

11        You must notify the probation officer at least 10

12   days before the change.  If notifying the probation officer

13   in advance is not possible due to unanticipated

14   circumstances, you must notify the probation officer within

15   72 hours of becoming aware of a change or expected change.

16        You must allow the probation officer to visit you

17   at any time at your home or elsewhere, and you must permit

18   the probation officer to take any items prohibited by the

19   conditions of your supervision that he or she observes in

20   plain view.

21        You must work full-time, at least 30 hours per

22   week, at a lawful type of employment unless the probation

23   officer excuses you from doing so.  If you do not have full-

24   time employment, you must try to find full-time employment

25   unless the probation officer excuses you from doing so.

1        If you plan to change where you work or anything

2   about your work, such as your position or your job

3   responsibilities, you must notify the probation officer at

4   least 10 days before the change.  If notifying the probation

5   officer at least 10 days in advance is not possible due to

6   unanticipated circumstances, you must notify the probation

7   officer within 72 hours of becoming aware of a change or

8   expected change.

9        You must not communicate or interact with someone

10  you know is engaged in criminal activity.  If you know

11  someone has been convicted of a felony, you must not

12  knowingly communicate or interact with that person without

13  first getting the permission of the probation officer.

14       If you are arrested or questioned by a law

15  enforcement officer, you must notify the probation officer

16  within 72 hours.

17       You must not own, possess, or have access to a

18  firearm, ammunition, destructive device, or dangerous weapon.

19  In other words, anything that was designed or is modified for

20  the specific purpose of causing bodily injury or death to

21  another person, such as nunchucks or tasers.

22       You must not act as an informant with a law

23  enforcement agency or act as a confidential human source or

24  informant without getting first the permission of the Court.

25       If the probation officer determines that you pose

1   a risk to another person, including an organization, the

2   probation officer may, after obtaining Court approval, notify

3   the person about the risk or require you to notify the person

4   about the risk, and you must comply with that instruction.

5         The probation officer may contact the person and

6   confirm that you have notified the person about the risk.

7         You must follow the instructions of the probation

8   officer related to the conditions of supervision.

9         The Court finds that the following special

10  conditions of supervision are determined to be reasonably

11  related to the facts enumerated in 18 U.S.C. section 3553(a),

12  and 18 U.S.C. section 3563(b), or they are based on the

13  nature and circumstances of the offense and the history and

14  characteristics of this particular Defendant.

15        These conditions do not constitute a greater

16  deprivation of liberty than necessary to accomplish the goals

17  of sentencing.

18        1.  If the judgment imposes a financial penalty,

19  you must pay the financial penalty in accordance with the

20  Schedule of Payments sheet of this judgment.

21        You must also notify the Court of any changes in

22  economic circumstances that might affect your ability to pay

23  the financial penalty.

24        2.  You must not incur any new credit charges or

25  open additional lines of credit without the approval of the

1   probation officer, unless you are in compliance with the

2   periodic payment obligations imposed pursuant to the Court's

3   judgment and sentence.

4         3.   You must provide the probation officer access

5   to any requested financial information, and authorize the

6   release of any financial information, until all financial

7   obligations imposed by the Court are paid in full.

8         4.   You must apply any monies received from income

9   tax refunds, lottery winnings, inheritances, judgments, and

10  any anticipated or unexpected financial gains, to the

11  outstanding Court ordered financial obligation in this case.

12        5.   If you have an outstanding financial

13  obligation, the probation office may share any financial or

14  employment documentation relevant to you with the Asset

15  Recovery Division of the U.S. Attorney's Office, to assist in

16  the collection of the obligation.

17        The Defendant shall pay a special assessment of

18  $10.00, which is $5.00 per count, and a fine of $3,000.00 as

19  to count two.

20        The special assessment and fine obligation are due

21  immediately.  Any unpaid monetary obligations upon release

22  from incarceration shall be paid in monthly installment

23  payments during the term of supervised release.

24        The monthly installment payment will be calculated

25  as at least 10 percent of the Defendant's gross monthly

1    income.

2              You are advised that you have the right to appeal

3    this sentence.  If you desire to appeal, the notice of appeal

4    must be filed with the Clerk of the Court within 14 days

5    after entry of judgment, or the right to appeal will be lost.

6              If you are unable to afford an attorney for an

7    appeal, the Court will appoint one to represent you.

8              If you so request, the Clerk of the Court will

9    immediately prepare and file a notice of appeal on your

10   behalf.

11             So the question at the moment is with regard to

12   surrender.  Mr. Schwab?

13             MR. SCHWAB:  Yes, Your Honor.  I would first ask

14   that you stay execution pending appeal.  We intend to appeal

15   this case, and obviously no appeal will be heard in 15 days,

16   rendering any potential successful appeal not necessarily

17   moot, but certainly less effective.

18             THE COURT:  Understood.  Mr. Fansler?

19             MR. FANSLER:  No objection to self-surrender or to

20   staying pending appeal.

21             THE COURT:  You don't object to a stay pending

22   appeal?

23             MR. FANSLER:  I do not.  No.

24             THE COURT:  Okay.  All right.  So the order will

25   be self-surrender upon conclusion of the appeal if the

1    conviction stands.

2             You didn't make that request with regard to the

3    fine.

4             MR. SCHWAB:  I apologize.  I meant to ask.

5             THE COURT:  And, Mr. Fansler?

6             MR. FANSLER:  I guess I don't -- it's not -- I

7    would oppose a stay of the fine.  I think there's no reason

8    to delay payment.

9             THE COURT:  What's the legal authority?  Is that

10   discretionary?

11            MR. FANSLER:  The fine amount?

12            THE COURT:  Whether to stay it or not.

13            MR. FANSLER:  I believe it is.  I don't have a

14   citation for it, though.

15        (Note:  Mr. Schwab is not near a microphone)

16            MR. SCHWAB:  I didn't know where to look.  In

17   State Court, a sentence like this would be automatically

18   stayed across the board, but --

19            THE COURT:  That's why I'm asking somebody whose

20   job it is to enforce the U.S. Code.

21            MR. FANSLER:  I don't know the authority for that,

22   Your Honor.  I don't object to staying enforcement of the

23   whole sentence.

24            THE COURT:  What about the term of probation?

25   You're asking for that, too?

1          MR. SCHWAB:  Yes, Your Honor.

2          THE COURT:  And what's your position on that?

3          MR. FANSLER:  Your Honor, the Court will impose

4    the judgment after this.

5          THE COURT:  Well, you have to have a final

6    judgment in order to be able to appeal, so.

7          MR. FANSLER:  That's right.  Yeah.  I guess now

8    that I'm thinking through everything, I don't -- I think the

9    whole sentence should be enforced.

10         THE COURT:  Would you like to reserve briefing on

11   that?

12         MR. FANSLER:  Yeah.  I would reserve briefing on

13   that.

14         THE COURT:  Okay.

15         MR. FANSLER:  Whether we'll oppose the stay or

16   not.

17         THE COURT:  So I wouldn't have objected to self-

18   surrender anyway, but I will require a short time frame on

19   the briefing.

20         Since it is your request, Mr. Schwab, how soon can

21   you get a brief on file with regard to staying the sentence

22   of the Court?

23         MR. SCHWAB:  I enter a jury trial next week, and I

24   have a significant Title IX action that is on summary

25   judgment motions that I think I'll be responding to right

1   around October 7th.  It's probably going to take me a couple

2   of months to be able to just --

3                  THE COURT:  I've given you some extensions already

4   in this whole process.  So.

5                  MR. SCHWAB:  At least until the 13th of October?

6                  THE COURT:  Hold on a second.

7        (Court confers with Court Clerk)

8                  THE COURT:  Okay.  So I do think this ought to be

9   a shortened time frame.  I'm sorry about the rest of your

10  obligations, but criminal cases supersede civil cases.  Did

11  you say you had a civil case coming up?

12                 MR. SCHWAB:  Yes.  I've got a jury trial next

13  week.

14                 THE COURT:  Okay.  It's a very discreet issue

15  whether I should impose a stay of the sentence pending

16  appeal.  So I'd like your position by Monday.

17                 MR. SCHWAB:  May I ask for a secondary stay?  Mr.

18  Cordova will be traveling out of the country at attend a

19  wedding.  Not out of the country, just out of state for a

20  wedding.  He bought tickets and hotels and everything for it.

21                 THE COURT:  Well, the restriction on travel is

22  during the period of probation, and probation hasn't started

23  until he walks out of prison.

24                 MR. SCHWAB:  I understand.  If the Court were to

25  impose a sentence before the --

```
 1              THE COURT:  Where is it?

 2              MR. SCHWAB:  Massachusetts.

 3              THE COURT:  And what are the inclusive dates?

 4              MR. SCHWAB:  The 10th through 17th.

 5              THE COURT:  Of?

 6              MR. SCHWAB:  October.

 7              THE COURT:  And it's whose wedding?

 8              MR. SCHWAB:  His best friend.

 9              THE COURT:  Is he a groomsman?

10              MR. SCHWAB:  He's best man.

11              THE COURT:  Okay.  I'll take that into

12    consideration.

13              And how quickly can you get a response?

14              MR. FANSLER:  If it's file by Monday, I can

15    respond by Thursday.

16              THE COURT:  Okay.  Thursday.  Monday, you want

17    close of business since you're in trial?  You probably should

18    file --

19              MR. SCHWAB:  Can I have until midnight?

20              THE COURT:  Okay.  Monday midnight.  Thursday

21    close of business, which is 5:00 o'clock.  Okay?

22              MR. FANSLER:  Yes, Your Honor.

23              THE COURT:  And no reply.  Okay?  I'll take the

24    burden of a reply off of you.

25              MR. SCHWAB:  Thanks, Your Honor.  That will mean
```

1    that final judgment won't enter yet?

2                THE COURT:  Correct.

3                MR. SCHWAB:  The appeal clock won't start until --

4                THE COURT:  Well, no.  Final judgment -- all

5    right.  So you want --

6                MR. SCHWAB:  If the final judgment enters today,

7    and then the stay --

8                THE COURT:  No.  I mean, the final judgment enters

9    whenever I execute it.  So in many trials, there's a lot of

10   post-trial proceedings, and it's months.  But I would then

11   propose, if it's okay with you, to enter final judgment

12   concurrent with my decision on whether to stay imposition of

13   the fine, the prison, and the probation.

14               MR. FANSLER:  Yes, that's correct, Your Honor.  I

15   don't have any objection to issuing the final judgment with

16   the ruling on that issue.

17               THE COURT:  Okay.  All right.  So let's -- since I

18   won't have you back, and it's efficient to talk about this

19   right now, you're proposing to file a brief on October 2nd.

20   The United States responding on October 5th.  October 9th is

21   a Federal holiday.

22               So in the event that I reach a decision some time

23   later in the week of October 9th, and I do permit your client

24   to travel, when do you want him to surrender?

25               MR. SCHWAB:  I would suggest -- well, I would

1   suggest the 18th or the 19th.  The 19th.

2           THE COURT:  Okay.  Any objection to him

3   surrendering on October 19th?

4           MR. FANSLER:  No objection to that date, Your

5   Honor.

6           THE COURT:  Okay.  All right.  Very good.  So what

7   is the timing -- is it 14 days for an appeal?

8           MR. FANSLER:  That's correct, Your Honor.

9           THE COURT:  All right.  So you will --

10          MR. FANSLER:  The notice of appeal within 14 days.

11          THE COURT:  Yes.  It will start running on entry

12  of final judgment.

13          MR. SCHWAB:  Your Honor, I assume the U.S.

14  Marshals are still in possession of personal property of Mr.

15  Cordova.  I would ask that you enter an order releasing that.

16          THE COURT:  What is it?

17          MR. SCHWAB:  His cell phone.

18          THE COURT:  Obtained when?

19          MR. SCHWAB:  At this arrest.

20          THE COURT:  Okay.

21          MR. FANSLER:  I don't think we need an order.  We

22  can return it any time.

23          THE COURT:  You mean on his arrest months ago?

24          MR. SCHWAB:  No.  For this Social Security

25  incident.

1              THE COURT:  That's what I mean, for this incident.

2    What date did it occur?

3              MR. FANSLER:  August 2, 2022.

4              THE COURT:  August 2, 2022.  So they have had his

5    cell phone since August 2, 2022.  Okay.  This is the first

6    I've heard of that.  You never have requested that back

7    anyway.

8              MR. FANSLER:  I did not.

9              THE COURT:  Just as evidence?

10             MR. FANSLER:  Yes.  If counsel wants to email me,

11   we can set up the return.

12             THE COURT:  Is that typical?

13             MR. FANSLER:  Usually they wait on a request just

14   because they don't like proactively look to return things.

15             THE COURT:  Have you ever requested this before?

16             MR. SCHWAB:  I don't know if I did a motion.

17             THE COURT:  All right.  Because any information

18   that was necessary for trial could be imaged off of the

19   physical phone.

20             MR. FANSLER:  They have no need for a report at

21   this point.

22             THE COURT:  All right.  So will you arrange?

23             MR. FANSLER:  Yes.

24             THE COURT:  Okay.  That's independent of anything

25   else.  He will arrange return of the phone.  Okay?

1          MR. FANSLER:  Your Honor, I spoke about the 14 day

2    appeal clock.  I just realized that the initial appeal on

3    this is to a District Court Judge.

4          THE COURT:  That's fine.

5          MR. FANSLER:  Rather than through the Federal

6    Rules of Appellate Procedure.

7          THE COURT:  Sounds correct.  Is it still 14 days?

8          MR. FANSLER:  That's what I was just going to look

9    up.  I thought that was going to be your follow up question.

10         MR. SCHWAB:  It is 14 days, Your Honor.

11         THE COURT:  What's the Statute?

12         MR. FANSLER:  I'm looking at it.  It's in the

13   Petty Docket Rule, which is the Rule.  Let me see if I can

14   find it here.  It's Rule 58.

15      (Pause)

16         MR. FANSLER:  Paragraph (g) looks like it related

17   to an appeal from a Magistrate Judge's order or judgment.

18   Defendant may appeal a Magistrate Judge's judgment of

19   conviction to a District Judge within 14 days of its entry.

20         THE COURT:  Okay.  So it still relies on the

21   judgment, so the judgment will start the clock at 14 days.

22   Your clock will start anyway with the judgment.

23         MR. SCHWAB:  Yes, but not today, right?

24         THE COURT:  Not today.

25         MR. SCHWAB:  All right.

1    THE COURT:  At least that's my view.  I think it

2  has to have a judgment.  The Statute says -- the Rule says

3  judgment, and no judgment has been entered.  A sentence has

4  been rendered, but the actual formal document is the judgment

5  itself, and that gives the exact terms of the sentence.

6    Mr. Fansler, what else?

7    MR. FANSLER:  Nothing further, Your Honor.

8    THE COURT:  And Mr. Schwab?

9    MR. SCHWAB:  Nothing, Your Honor.

10   THE COURT:  All right.  Thank you for your

11 appearances today.  We'll be in recess.

12   MR. SCHWAB:  Thank you.

13   THE COURT CLERK:  All rise.

14   (Time noted:  2:41 p.m.)

15   * * * * *

16   <u>CERTIFICATE</u>

17   I, RANDEL RAISON, certify that the foregoing is a

18 correct transcript from the official electronic sound

19 recording of the proceedings in the above-entitled matter, to

20 the best of my ability.

21

22

23 _____          March 18, 2024

24 Randel Raison

25